*MHN*

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

JUL 2 5 2008 *TC*

Jul 25 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA ex rel.
MELVIN NEWMAN (R14947)          )

               Petitioner,

**08CV4240**
**JUDGE DOW**
**MAGISTRATE JUDGE MASON**

vs.

DON HULICK, Warden,          )
                             )

               Respondent.          )  Case No. of State Ct. Conviction
                             )  No. 01 CR 19103

## MEMORANDUM IN SUPPORT OF PETITION FOR HABEAS CORPUS

Petitioner MELVIN NEWMAN by his attorney, Steven A. Drizin, Northwestern

University Bluhm Legal Clinic, respectfully submits the following Memorandum of Law

to accompany his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

### Introduction

This petition raises important constitutional questions about the quality of counsel

afforded to mentally retarded juvenile defendants and the roles that trial counsel and the

state courts must play to ensure that such defendants are competent to stand trial. Melvin

Newman is entitled to federal habeas relief because he was entirely deprived of such

protection in violation of his Fourteenth Amendment due process rights. In addition,

Melvin's lawyer's performance – in failing to investigate Melvin's competency and

failing to seek a competency hearing – deprived him of his Sixth Amendment right to

effective assistance of counsel. The state court decisions denying Melvin's post-

conviction petition raising these issues unreasonably applied the principles enunciated in

*Strickland v. Washington*, 466 U.S. 668 (1984) and *Dusky v. United States*, 362 U.S. 402

(1960) and their progeny. Morever, Melvin is entitled to federal habeas relief because the state courts' determinations with respect to Melvin's fitness to stand trial were factually unreasonable given that they ignored an unrebutted expert opinion that Melvin was unfit and were made without the benefit of an evidentiary hearing.

I.    **Factual Background**

A.    **Evidence Relating to Melvin's Fitness Available to Attorney Johnson Prior to Trial**

On the evening of July 13, 2001, Andrew Dent was shot and killed outside of his home at 5652 S. Wells in Chicago. Sixteen year-old Melvin was subsequently arrested and charged, as an adult, with first-degree murder in connection with Dent's death.

Prior to Melvin's arrest, upon learning that the police were looking for her son, Melvin's mother, Barbara Newman, retained defense attorney Michael Johnson to represent Melvin. In their initial conversations, Ms. Newman told attorney Johnson that her son was a "special child" who had been in and out of special education classes his whole life and who had difficulty understanding things. Upon request, she provided attorney Johnson with a stack of records which documented the extent of Melvin's disabilities, including medical records, hospital records, Social Security disability records, and school records.[1] (Exhibit C to Appendix to Habeas Petition ("App. Ex") at C.L. 427). These records demonstrated that Melvin was mentally retarded and functionally illiterate and that from the time he entered the Chicago Public School system until the time of his arrest, he made little or no progress in his education despite extensive efforts at remediation. (See App. Exs. D-G, at C.L. 136-186).

---

[1] Citations to the Common Law Record appear here as "C.L.," citations to the Report of Proceedings in the post-conviction proceedings appear as "RP", and citations to the Report of Proceedings from Melvin's original trial appear as "R'. Exhibits to the Appendix of Melvin's Petition for Writ of Habeas Corpus are cited as "App. Ex."

On September 7, 1990, five year-old Melvin Newman entered kindergarten at the Oglesby Elementary School. At around this time, Melvin's mother first noticed that Melvin was different from other children. While other children were learning to read and write, Melvin made no progress in these areas. (App. Ex. C, at C.L. 429). In 1993, at the age of seven years and eleven months, Melvin was referred for a full case study by the Chicago Public Schools. Based on this study, Melvin was determined "eligible to receive services through the learning disabilities program." (App. Ex. G, at C.L. 479).

On December 1, 1995, at the age of eleven, Melvin was found to be a "disabled child" and eligible for social security disability benefits due to his mental retardation. (App. Ex. D, at C.L. 530).

In February 1999, when Melvin was fourteen years of age, the Chicago Public Schools issued a student transfer for Melvin, removing him from the special education program at his mainstream school and placing him at the Montefiore Special School. Prior to this transfer, Melvin was again given an academic evaluation. This 1998 evaluation states that "Melvin's reading scores are at the first grade level [and his] math scores are at the second grade level." Specifically, the report states that Melvin, thirteen at the time, read at a grade level of 1.4 and performed math functions at a grade level of 1.7. (App. Ex. E, at C.L. 460-463).

Melvin's next evaluation occurred on July 19, 2000. Dr. Lea Lewis, the School Psychologist at Robeson High School, conducted the Wechsler Individual Achievement Test ("WIAT") on Melvin, then fifteen years and seven months old. According to Dr. Lewis, Melvin's reading and math "exceed[ed] only approximately 1% of students his

age. (App. Ex. G, at C.L. 159-163). In other words, just one year before the murder, Melvin was found to be functioning at a level below 99% of his peers.

Dr. Lewis also conducted the Kaufman Brief Intelligence Test ("K-BIT") during the 2000 evaluation. On this test, Melvin "obtained an IQ Composite Score of 62. This test also placed Melvin in the 1st percentile" and dictated Melvin's "classification… in the Lower Extreme range of intellectual ability." (C.L. 161). The K-BIT also measured Melvin's non-verbal skills, including his ability to solve new problems, to understand non-verbal relationships and to use non-verbal abstract reasoning. Here, Melvin's score of a 71 placed him in the "Well Below Average" range of intellectual ability. (C.L. 162). Finally, in this report, Dr. Lewis also stated that Melvin appeared to be illiterate. (C.L. 163).

On July 20, 2000, Robeson Evaluators created an Individualized Education Program Plan ("IEP") for Melvin. On the IEP Summary Sheet, the evaluators indicated that Melvin had extreme difficulty in many of the most basic skills he needed to be educated. (App. Ex. H, at C.L. 169-182). The IEP summary sheet states that Melvin 1) had difficulty following directions; 2) processed information slowly; 3) had difficulty with math reasoning, 4) had a short auditory attention span, 5) was distracted easily and loses focus concentration often; 6) spelled poorly; 7) had trouble putting ideas on paper; 8) read aloud with great difficulty; 9) had difficulty understanding concepts; 10) recalled previously mastered facts slowly; 11) had difficulty following multiple verbal requests; 12) was frequently distracted by extraneous noise; 13) was disorganized and often misplaces things; and 14) had difficulty copying from the board. (C. L. 180).

Despite his knowledge of these deficits, attorney Johnson made no efforts to ensure that Melvin understood the nature of the criminal proceedings against him or that Melvin was able to assist in his defense in a meaningful way. While Melvin was held in the Cook County Juvenile Temporary Detention Center ("JTDC") for approximately eleven months leading up to his trial, attorney Johnson did not visit him, did not speak to him by telephone, and did not correspond with him in anyway. (App. Ex. K, ¶ 17, at C.L. 420). According to Melvin, their only contacts consisted of very brief conversations in court or in the lockup behind the courtroom before or after scheduled court hearings. (C.L. 420).

Not only did Melvin's trial counsel fail to visit Melvin at the JTDC, he also did not speak to any of Melvin's teachers, at the JTDC or elsewhere. As a result, he failed to hear what Katherine Daphne Whitington, Melvin's reading teacher at JTDC, had to say about Melvin. Eager to learn to read, Melvin approached Ms. Whitington and asked for her help with reading. When Melvin first came to meet with her, Ms. Whitington assessed his reading skills by giving him third or fourth grade material to read. Melvin was a complete non-reader. (App. Ex. J, ¶¶ 10-11, at C.L. 444).

Ms. Whitington began by teaching Melvin the alphabet. She spent an hour a day with Melvin for the entirety of his time in the JTDC. Learning the alphabet was a struggle for Melvin and he often grew frustrated at his inability to understand. (¶ 12, at C.L. 444). According to Ms. Whitington, who taught children as young as ten with reading disabilities, Melvin had "the worst reading skills" of all the students she had taught. Despite her daily lessons and intensive instruction, Melvin could only read and write at a first grade level. (¶ 16, at C.L. 445).

5

By working closely with Melvin, Ms. Whitington also saw other problems that
interfered with Melvin's ability to learn -- problems which relate to his competency to
stand trial -- including memory problems and difficulty understanding abstract concepts.
Throughout the course of her relationship with Melvin, it was obvious to Ms. Whitington
that Melvin did not understand what was going on in his case. His lack of understanding
was especially evident when she would ask him questions that required more than a "yes"
or "no" answer. She specifically recalled that when Melvin told her he was convicted, he
told her that he was going to prison for four to seven years – he did not even understand
that he had been sentenced to forty-seven years. Although she was willing to testify
about the extent of Melvin's disabilities, Ms. Whittington was never contacted by
attorney Michael Johnson. (¶¶ 20-22, at C.L. 445).[2]

Immediately prior to arriving at the JTDC, Melvin was a special education student
at Las Casas School in Chicago. There, Melvin was taught by June Randall, a teacher
and counselor who had taught special education students for thirty years. (App. Ex. I at
C.L. 448). In 2000-2001, Ms. Randall taught Melvin biology in a small classroom setting
that included ten students, one teacher, and one teaching assistant. (C.L. 449). Had
attorney Johnson spoken to Ms. Randall, he would have learned that "Melvin was a truly
mentally retarded student" who had trouble understanding complex concepts and "needed
to have things explained to him in concrete steps." (C.L. 449).

None of this extensive information relating to Melvin's disabilities, all of which
either was available or could have been available to attorney Johnson prior to the trial

---

[2] Ms. Whittington was so concerned about Melvin's lack of understanding of his legal
proceedings that she obtained a copy of Melvin's trial transcripts and, after reviewing them,
contacted attorneys at the Bluhm Legal Clinic to seek representation for Melvin.

through minimal investigation or consultation with Melvin, his family, and other professionals who worked closely with him, was ever presented to the court.

**B.  <u>Additional Evidence, Developed After Trial, that Melvin's Was Not Fit to Stand Trial at the Time of his Trial</u>**

On September 12, 2003, Marci J. Shaffer, the school psychologist at Menard Correctional Center, conducted a psychological evaluation of Melvin Newman, then eighteen years and nine months old.  This psychological evaluation indicates what attorney Johnson could have learned and disclosed prior to trial had he carefully reviewed Melvin's school records or consulted an expert.  Melvin's Psychological Report includes Melvin's results on the Test of Adult Basic Education ("TABE") conducted on August 21, 2002, *just a few weeks after Melvin was sentenced.* (emphasis added). (App. Ex. N, 516-521).  This test indicated that Melvin's reading and math skills remained below that of an average second grader. (C.L. 517).  The report includes Melvin's results on various intelligence tests including the Wechsler Abbreviated Scale of Intelligence ("WASI").  On this test, Melvin received a full scale score of 65, indicating that Melvin's "functioning is estimated at the Mentally Impaired range." (C.L. 519).  The report also noted that Melvin "is essentially illiterate" and could not tell time, read the expiration date on a bottle of pills, follow recipes or understand common abbreviations, and scored in the bottom one percentile for math and reading.  (C.L. 520).

On May 6 and 27, 2005, at the request of post-conviction counsel, Dr. Antoinette Kavanaugh, the Clinical Director of the Juvenile Justice Division at the Cook County Juvenile Court Clinic, met with Melvin and conducted a forensic psychological evaluation of Melvin Newman, then twenty years and five months old. (App. Ex. O, C.L. 560-577). Her evaluation sought to answer the following questions: 1) Does Melvin have

cognitive deficits; 2) if so, are those deficits readily apparent and were they apparent during his trial; and 3) is he currently fit to stand trial and would he have been fit to stand trial previously? (C.L. 560). Dr. Kavanaugh interviewed Melvin over a span of two days for a total of five hours. She reviewed his educational records, Social Security disability records, medical and other records, and spoke at length with Melvin's mother and his teacher at the time of his trial, Ms. Whitington. (C.L. 561-573). As part of the evaluation, Dr. Kavanaugh also administered two standardized tests to Melvin: the Wechsler Adult Intelligence Scale-3[rd] Edition ("WAIS-III") and the Wechsler Individual Achievement Test-II ("WIAT-II").

Results on the WAIS-III indicate that Melvin's intellectual abilities fall in the Extremely Low range and that he scored a Full Scale IQ of 54. (C.L. 568-569). Melvin's performance on the WIAT-II is also indicative of his academic abilities. He scored in the less-than 0.1 percentile in Word Reading, Mathematics Reasoning, Reading Comprehension and Listening Comprehension, placing Melvin developmentally behind 99.9% of the population. Also according to these test results, Melvin's ability to read words is still equivalent to that of an average 7 year-old. Similarly, Melvin's reading comprehension skills are equivalent to someone who is "not yet age 6." (C.L 569). Melvin's mathematics reasoning abilities are equivalent to the average 5 year-old and his listening comprehension abilities are that of an average 4 year, 8 month-old person. (C.L. 569).

Dr. Kavanaugh found Melvin's deficits to be "readily apparent" both at the time of the evaluation and at the time of his trial, and noted that they repeatedly surfaced during casual conversations with Melvin. (C.L. 566, 575-6). Dr. Kavanaugh found

Melvin to be Moderately to Mildly Mentally Retarded and found that his deficits "should have been apparent to anyone who attempted to have [a] conversation with [him] and posed questions to him that required more than a yes-or-no answer." (C.L. 576).

Dr. Kavanaugh also tested Melvin for fitness to stand trial, asking him a series of questions to test his knowledge about his legal proceedings, teaching him information about what he did not know, and then attempting to assess how much information he retained between interviews. (C.L. 569). She concluded in her report that Melvin is "not currently fit to stand trial nor would he have been fit to stand trial previously." (C.L. 576-577). Dr. Kavanaugh found that Melvin does not understand basic legal concepts such as "witness," "evidence," "appeal," "defense," or "testify." For example, he defined the term "evidence" as "those people in white jackets," failing to distinguish that those people collected evidence and were not themselves evidence. Nor did Melvin understand the roles of the judge, jury, prosecutor and defense attorney, even after these concepts had been explained to him. Dr. Kavanaugh opined that Melvin "cannot and was not able to assist in his own defense." (C.L. 577-578).

## II.   Procedural History

### A. Melvin Newman's Trial

At no time prior to or during the trial, did attorney Michael Johnson raise any issues with respect to Melvin Newman's fitness to stand trial. Opening statements in Melvin Newman's trial commenced on July 1, 2002 in the Circuit Court of Cook County before the Honorable Vincent M. Gaughan. (R. E1.) The jury returned its verdict of guilty two days later on July 3, 2002. (R. G96). At the trial, a total of 13 witnesses testified, none of whom were called by the defense. As far as the record is concerned,

9

Melvin was mute throughout the entire trial, except for two brief moments when he was asked to speak to the court.

The first occurred when attorney Johnson informed the court that he had discussed with Melvin and his mother Melvin's right to testify on his own behalf and that Melvin had chosen to waive that right. (R. F207.) The court asked Barbara Newman whether she had discussed Melvin's right to testify with Melvin and attorney Johnson. Ms. Newman told Judge Gaughan that she had. (R. F209.) However, Ms. Newman now states that, in fact, she had only a brief discussion with attorney Johnson about Melvin testifying. Ms. Newman states that "Michael Johnson told me that it would be better for Melvin if he did not testify. Mr. Johnson said that the prosecution would 'eat Melvin up' if he testified. Because he was the attorney and I had never been through a trial before, I accepted his decision for Melvin not to testify." (App. Ex. C, ¶ 24, C.L. 428).

Similarly, Melvin Newman states that Mr. Johnson did not talk to him about testifying in his case. (App. Ex. K ¶ 20, at C.L. 421). Despite this, Melvin did tell the court that it was his wish not to testify, and that he discussed this matter with attorney Johnson. (R. F208-209.) The court's colloquy with Melvin consisted entirely of a "yes-or-no" line of questioning. The one time the court asked an open-ended question, Melvin still replied with a "yes-or-no" response:

> The Court:    And knowing all of this, your constitutional rights to testify and not testify and having discussed it with your mother and your attorney, what is your wish?
>
> Melvin:    No, sir. (R. F-209.)

Instead of asking Melvin to explain what he meant, the judge simply rephrased the question to call for a "yes" or "no" answer. (R. F-209).

Shortly thereafter, attorney Johnson also told the court that he had discussed the possibility of a lesser included charge of second-degree murder with Melvin and Ms. Newman and that he told Melvin "that really it's his decision whether or not to pursue that." Attorney Johnson went on to state that it was "Melvin's decision and his mother's decision that we were just going to request only a not guilty for first-degree and not [a] second-degree instruction." (R. F214.) Thereafter, the court asked Melvin about a second-degree murder instruction: "And so after consulting with your attorney, do you want a second-degree murder instruction?" To this, Melvin answered, "No, sir." (R. F214-15). According to Melvin, however, prior to Melvin's colloquy, attorney Johnson had instructed Melvin to look at him before answering a question. If attorney Johnson tapped his own leg once, Melvin was to answer, "Yes," and if attorney Johnson tapped his leg twice, Melvin was to answer, "No." Melvin answered questions according to these instructions. (App. Ex. K, ¶ 22, at C.L. 422). Again, the court's colloquy with Melvin consisted entirely of a "yes-or-no" line of questioning. (R. F214-215).

In fact, attorney Johnson never explained to Melvin the difference between first and second-degree murder, particularly the difference in the sentencing outcomes of convictions on those charges. For example, before making his decision, attorney Johnson failed to tell Melvin that the sentencing range for second-degree murder was four to fifteen years, and that if convicted of first-degree murder, he would receive a sentence of twenty to sixty years. Attorney Johnson failed to explain to Melvin that he would be required to serve one hundred percent of a first-degree murder sentence, though only

11

eighty-five percent of a second-degree murder sentence. But most importantly, attorney Johnson failed to tell Melvin that a first-degree murder conviction would carry with it a mandatory twenty-five year enhancement for discharging a weapon, while the second-degree conviction would not. This critical information, which would have been extremely difficult for Melvin to understand given his disabilities, was never explained to Melvin. (App. Ex. K, ¶ 23, at C.L. 422).

After the jury convicted Melvin Newman of the first degree murder of Andrew Dent (R. G96), attorney Johnson filed a motion for a new trial on Melvin's behalf in which he again failed to raise any issues with regard to Melvin's fitness. (R. H3). At sentencing, attorney Johnson again failed to present a single witness on Melvin's behalf. (R. H11-15). Attorney Johnson did not present any information about Melvin's retardation or his other profound disabilities, factors which would have been powerful mitigation and could have alerted the trial court to concerns relating to Melvin's fitness.

On August 8, 2002, Melvin was sentenced to forty-seven years in the Illinois Department of Corrections. He received twenty-two years for the murder and a twenty-five year mandatory enhancement for the discharge of a firearm in connection with that murder. (R. H18). When the sentence was pronounced, Melvin thought that he had been sentenced to four to seven years. (C.L. 422), a fact later corroborated by Melvin's reading teacher Daphne Whitington (App. Ex. J, ¶ 20, at C.L. 422), his mother (App. Ex. C., C.L. 566), his aunt, Victoria Kelly (C.L. 113, 442), and his girlfriend, Trisha Clare (C. L. 547).[3]

---

[3] For some reason, the Circuit Court appears to have misnumbered Victoria Kelly's affidavit. Page 442 of the Common Law Record appears before page 113 of the Record.

## B. <u>Direct Appeal</u>

On direct appeal, Melvin raised three grounds for relief: (1) Melvin was denied a fair trial because the trial court refused to instruct the jury on self-defense or second-degree murder; (2) trial counsel was ineffective for failing to request an instruction on second-degree murder and failing to provide a defense; and (3) the State's closing argument misstated the evidence and therefore denied Melvin a fair trial.. On March 31, 2004, the Illinois Appellate Court, First District, affirmed Melvin's conviction in an unpublished order. *See People v. Newman*, No. 1-02-2615. (C.L. 294-313, attached as App. Ex. A).

## C. <u>Melvin's Post-Conviction Petitions</u>

On October 21, 2004, with the *pro bono* assistance of the Bluhm Legal Clinic, Melvin filed a post-conviction petition before the Honorable Vincent M. Gaughan. On December 9, 2004, Melvin filed a Motion to Amend and Supplement his Post-Conviction Petition with affidavits of Allison Clare and Trisha Clare, two alibi witnesses for Melvin. On December 16, 2004, Melvin filed a Second Motion for Leave to Amend and Supplement the Post-Conviction Petition, seeking court permission to supplement Melvin's Post-Conviction Petition with affidavits and other exhibits relating to a previous case, *People v. Oscar Burgos*, 84 C 10463, in which the ineffectiveness of attorney Johnson was at issue for failing to call alibi witnesses. This motion was granted, prompting Melvin to file, on August 4, 2005, a Second Supplemental Petition for Post-Conviction Relief. This petition raised three claims alleging that his conviction for first-degree murder was the result of a denial of his constitutional rights under the Illinois and the United States Constitutions. (C.L. 316- 500, 509-582). These three claims were that:

(1) attorney Johnson failed to adequately consult with Melvin before and during his trial and sentencing; (2) attorney Johnson failed to adequately investigate or raise the issue of Melvin's incompetence to stand trial; and (3) attorney Johnson failed to investigate Melvin's potential claims of actual innocence.

On May 16, 2006, the State of Illinois filed a Motion to Dismiss the Petition for Post-Conviction Relief claiming that the doctrines of *res judicata* and waiver barred the trial court from hearing Melvin's post-conviction claims for relief. In addition, the State argued that Melvin failed to prove that Michael Johnson's representation was ineffective. (C.L. 502-507). On June 13, 2006, Melvin filed a response to the state's motion to dismiss.

On June 21, 2006, the circuit court disposed of Melvin's post-conviction claims in a brief hearing. Denying Melvin's request for an evidentiary hearing, the court made factual findings based on evidence within the record that it found contradicted the newly discovered evidence from outside the record. With regard to Melvin's claim that Attorney Johnson was ineffective for failing to raise the issue of Melvin's fitness, the court relied on nothing beyond its own recollections of the trial to find that Melvin was not unfit, stating:

> "[a]s to fitness, I personally had conversations with Mr. Newman; and I'm not inexperienced in this matter. And his responses were correct. *If he was drooling or if his eyes were going someplace, counsel, I assure you, I would have sua sponte asked for a fitness hearing.*"

(App. Ex. P, RP, at 17) (emphasis added). The court also ruled that Melvin's claim that attorney Johnson instructed him to answer "yes" or "no" based on the tapping of his leg was "carrying it a little bit too far." (App. Ex. P, RP, at 17-18.)

14

The court also rejected Melvin's claims that attorney Johnson failed to consult adequately with Melvin, failed to request a second degree murder instruction, and failed to provide a defense. These claims apparently were rejected on *res judicata* grounds as the court relied on the fact that the Illinois Appellate Court did not find Michael Johnson to be ineffective when these claims were raised on direct appeal. (*Id.*, at 17-18). The Court never even addressed Melvin's third count – that Michael Johnson failed to investigate Melvin's Newman's alibi defense and other evidence of his actual innocence. The circuit court then dismissed the petition, finding that there was not a "substantial violation of Mr. Newman's rights that would require relief under the Post-Conviction Act." (*Id.*, at 18).

### D. Appeals of Dismissal of Post-Conviction Petition

Melvin filed an appeal of the post-conviction court's dismissal of his post-conviction petition, raising the following arguments, four of which related directly to the way in which the trial court dismissed Melvin's claim that his counsel had been ineffective for failing to investigate Melvin's competency and seek a competency hearing, including 1) whether the trial court erred in refusing to hold an evidentiary hearing on Melvin's claim that attorney Johnson was ineffective for failing to adequately consult with Melvin prior to and during the trial; 2) whether the trial court erred in refusing to hold an evidentiary hearing on Melvin's claim that attorney Johnson was ineffective for failing to investigate and raise the issue of Melvin's fitness to stand trial; 3) whether in assessing Melvin's claim that attorney Johnson was ineffective for failing to raise the fitness issue, the trial court applied an erroneous standard – whether or not Melvin was "drooling or rolling his eyes someplace" – to determine that Melvin was not

unfit and 4) whether the trial court's comment that Melvin was fit because he was not "drooling or rolling his eyes someplace, were so offensive and prejudicial as to indicate bias such that if this case is reversed and remanded for an evidentiary hearing, a new judge should be appointed to preside over Melvin's case.[4]  On September 4, 2007, the appellate court, in a 2 to 1 decision (Wolfson, J., dissenting), affirmed the dismissal of Melvin's post-conviction petition. *People v. Newman*, No. 1-06-1977 (App. Ex. B).

The Illinois appellate court reviewed the documents that were provided to trial counsel by Melvin's mother and found that, "[a]t most, they establish that he has limited intellectual ability, but do not speak to his fitness to stand trial." (App. Ex. B, at 9). Citing selectively from these reports, the court found that the records "do not indicate anything other than that the defendant was academically challenged and a slow learner", and held that Melvin failed to demonstrate that a *bona fide* doubt existed as to Melvin's fitness to stand trial at the time of his trial. (*Id.*, at 10).  The Court rejected the only evidence in the record concerning Melvin's unfitness to stand trial – the report of Dr. Antoinette Kavanaugh —- as "irrelevant" in terms of considering whether the defendant was unfit at the time of trial because "the evidence must be considered in light of the facts known at the time of trial."  (*Id.*, at 11.)

Justice Wolfson dissented from the Order, writing: "Petitioner presents allegations about his unfitness for trial and his ability to waive his right to testify and his right to seek a second degree murder instruction that warrant further inquiry. That is, I believe he has

---

[4] A fifth claim on appeal concerned whether the trial court erred in refusing to hold an evidentiary hearing on Melvin's claim that attorney Johnson was ineffective for failing to investigate Melvin's alibi defense and other evidence pointing to his innocence.  We still maintain that Melvin is innocent and are continuing to investigate Melvin's claims of actual innocence but do not seek review of this aspect of the state courts' decisions at this time.

made a substantial showing of a constitutional violation in the second stage hearing. I would send the case back for an evidentiary hearing." (*Id.,* at. 14).

Melvin filed a petition for leave to appeal to the Illinois Supreme Court which was denied on January 30, 2008.

## III.    Claims for Relief

Under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), a petitioner is entitled to relief if the state-court adjudication "resulted in a decision that: (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams,* 529 U.S. at 405. A state court decision runs afoul of the "unreasonable application" provision if "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," or "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. Under this provision, a federal court is required to defer to a reasonable state

court decision. *Denny v. Gudmanson,* 252 F.3d 896, 899-900 (7th Cir. 2001); *Anderson v. Cowan,* 227 F.3d 893, 896-97 (7th Cir. 2000).

Under AEDPA. 28 U.S.C. § 2254(d)(2), a petitioner may also obtain habeas relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Under (d)(2), state court factual findings are entitled to great deference; however, "relief may be had where the petitioner can show by clear and convincing evidence that the state court's factual determinations were unreasonable." *Harding v. Walls*, 300 F.3d 824, 828 (7th Cir.2 002) (citing 28 U.S.C. § 2254(e)(1) and explaining that courts refer to (e)(1) for the petitioner's burden of proof when that petitioner tries to make a(d)(2) showing of unreasonable state court factual determinations).

In the instant case, Melvin is entitled to federal habeas relief because the state courts unreasonably applied the principles of *Strickland v. Washington*, 466 U.S. 668 (1984) and *Dusky v. United States,* 362 U.S. 402 (1960) and their progeny to the facts of Melvin's case. He is also entitled to federal habeas relief because the state trial courts' adjudications that Melvin was competent to stand trial or that there was not a *bona fide* doubt as to his competency were based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Here, the state courts' determinations regarding Melvin's competency were made without holding an evidentiary hearing and were contrary to the only evidence in the record addressed to the question of Melvin's competency – the report of a forensic psychologist that found that Melvin was not fit to stand trial and is not currently fit to stand trial.

A.  **The State Courts Unreasonably Applied the Principles of _Strickland_ and _Dusky et al._ in Denying Melvin's Claim that his trial counsel was ineffective for failing to investigate Melvin's competency or seek a competency hearing**

The Sixth Amendment to the United States Constitution guarantees every defendant the right to effective assistance of counsel. U.S. Const. amend. VI. The Supreme Court has established a familiar two-part test to determine if counsel's errors deprived a defendant of this constitutional guarantee. First, the court must determine if counsel's performance fell below an "objective standard of reasonableness." _Strickland v. Washington_, 466 U.S. 668, 688 (1984). Second, the court must determine whether these errors prejudiced the defendant — i.e., "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." _Id._ at 694.

There is a two-part standard for ascertaining competency to stand trial: (1) whether the defendant has the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "whether he has a rational as well as factual understanding of the proceedings against him." _Dusky v. United States,_ 362 U.S. 402 (1960.) An attorney undoubtedly renders ineffective assistance when "he or she fail[s] to inquire into a defendant's competency and fail[s] to request a competency hearing, despite indicia of incompetence that would provide reasonable counsel 'reason to doubt' the defendant's ability to understand the proceedings, communicate with counsel, and assist in his own defense." _Jermyn v. Horn,_ 266 F.3d 257, 300 (3d Cir. 2001). _See also Brown v. Sternes_, 304 F.2d 677, 692 (7th Cir. 2002) (when it is apparent from "sources of information not requiring fresh investigation, that the defendant has

some mental or other condition that will repay further investigation...then the failure to investigate will be ineffective assistance").

Neither the state post-conviction court nor the appellate court addressed the issue of whether trial counsel's performance was deficient in failing to investigate competency or seek a competency hearing. Focusing only on the prejudice prong, the appellate court held that Melvin was not prejudiced because the information available to trial counsel at the time of trial did not raise a *bona fide* doubt of Melvin's competency. App. Ex. B, at 11. In arriving at this conclusion, the appeals court unreasonably applied United States Supreme Court case law under which trial counsel was both deficient and his deficient performance prejudiced Melvin.

### 1. The Performance of Melvin's Lawyer was Constitutionally Deficient.

A defense attorney's duty to investigate is a fundamental and long-recognized component of effective representation. It goes without saying that counsel has an obligation either to investigate possible defenses or to make reasonable decisions that particular defenses are unnecessary. *Kimmelman v. Morrison,* 477 U.S. 365, 385 (1986). Once information surfaces which calls into question a client's competency, counsel has a duty to investigate further, that is, to "follow leads that would lead them to discover" other evidence of unfitness. *See, e.g., Wiggins,* 539 U.S. 510, 523-28 (2003) (finding ineffective assistance based on counsel's failure to follow leads that would have lead him to discover evidence of, among other things, diminished mental capacities); *Williams,* 529 U.S. at 395 (finding counsel's performance deficient where counsel failed to conduct an investigation that would have produced evidence of, among other things, mental retardation).

20

Trial counsel here was given information at the outset of his representation by Melvin's mother which should have alerted him to the fact that Melvin's competency was an issue in that Melvin might not have been able to comprehend the proceedings. These records demonstrated that Melvin was so mentally retarded that he qualified for social security disability benefits. They also indicate that he was diagnosed as severely learning disabled at the age of seven and that despite extensive efforts by the school system to remediate his disabilities, he was still illiterate at the time of trial. Evaluations conducted just months prior to the crime in this case also noted that Melvin's extensive disabilities related directly to areas that concern competency, including that Melvin had "difficulty following directions," "processes information slowly," "has a short auditory attention span," "is distracted easily and loses focus concentration often," "has difficulty understanding concepts," and "recalls previously mastered facts slowly". (App. Ex. H, C.L. 180).

To a reasonably competent defense attorney, these records should have signaled that Melvin's fitness required exploration and prompted further investigation. With Melvin's trial counsel, however, the import of these records fell on deaf ears. To a reasonably competent attorney, these records would have required counsel to meet with Melvin frequently, to take the time to explain things to Melvin in the most basic terms and to test Melvin's understanding of the nature of the proceedings at various intervals to see if he had truly absorbed knowledge of these matters. A reasonably competent attorney would have explained to Melvin and made sure he understood basic legal concepts as well as the critical trial and sentencing decisions that he would have to make at trial, including but not limited to, whether to testify, whether to call witnesses in his

defense, the differences between first and second degree murder, and the sentencing consequences of foregoing a second degree murder instruction.

Melvin's trial counsel, however, did none of these things. He never met with Melvin during the eleven months he was at the juvenile detention center, having instead only short and non-substantive conversations with Melvin in the lockup after court appearances. Had he spent even a few minutes of quality time with Melvin, trial counsel would have learned what was patently obvious to Melvin's relatives, teachers, and psychologists – that Melvin did not have a clue about what was happening throughout the course of his case and could not participate in his own defense. (C.L. 574)[5]

Melvin's claim of deficient performance is particularly compelling because defense counsel had information in his possession that was unknown to or unavailable to the trial court. *Burt v. Uchtman*, 422 F.3d 557, 567 (7th Cir. 2005). In such circumstances, absent action by defense counsel, the trial court is not in a position to *sua*

---

[5] This is not the first time that Melvin's trial counsel, Michael Johnson has had to face allegations of ineffective assistance of counsel for his failure to raise a defendant's competency to stand trial and his failure to interview witnesses. In the strikingly similar case of *People v. Michael Davenport*, Cook County Case No. 84-7581, attorney Johnson represented seventeen year-old Michael Davenport in his trial for the 1984 murder and armed robbery of Cleophus Zeigler. Michael Davenport was found guilty of first degree murder and armed robbery and sentenced to 75 years in prison. Natalie Frederickson, Davenport's post-conviction counsel, submitted an affidavit in support of Melvin's petition, claiming that Attorney Johnson's conduct was nearly identical in Davenport's case. Despite knowing that Davenport was illiterate and attending a special school, Johnson failed to investigate and raise the issue of Davenport's mental retardation at either the trial or sentencing. (App. Ex. Q, ¶¶10-11, at C.L. 439). Had he done so, attorney Johnson would have learned that testing of Davenport consistently revealed that he had an IQ of 44 to 46 and possessed the mental abilities of a five year old. (¶ 11). Davenport also alleged that Johnson failed to interview his alibi witnesses. (¶¶14-15, C.L. 440). *See also*, Maury Possley & Steve Mills, *Petitioner's Bid to clear name hits roadblock, evidence filed too late*, CHICAGO TRIBUNE, March 31, 2002, at 1, *available at* 2002 WLNR 12624819. Davenport was eventually denied post-conviction relief but only after an evidentiary hearing. *Cook judge rejects retrial for convicted killer, robber*, CHICAGO TRIBUNE, February 27, 2003, at 6, *available at* 2003 WLNR 15285669.

*sponte* order a fitness hearing for the defendant. *Id.,* at 570. This is especially true in cases involving mentally retarded defendants who are often quiet and well mannered and who fail to exhibit any behaviors (such as drooling, giggling, smiling with a vacant appearance, rocking) which factfinders stereotypically associate with incompetency.[6] Michael L. Perlin, *"Life in Mirrors, Death Disappears": Giving Life to Atkins,* 33 N.M.L. REV. 315, 335 (Spring, 2003).

### 2.    Melvin was Prejudiced by His Lawyer's Failure to Investigate Competency and Pursue a Competency Hearing.

The relevant inquiry on the prejudice prong in cases in which the defendant argues that his counsel should have sought a fitness hearing is whether there is a "reasonable probability" that the defendant would have been found unfit to stand trial had a hearing been held. *Eddmonds v. Peters,* 93 F.3d 1307, 1317 (7th Cir. 1996). This question should have been easily answered in this case by the state courts based upon the unrebutted testimony of the lone expert to opine on the question of Melvin's competence to stand trial. Indeed, forensic psychologist Dr. Antoinette Kavanaugh opined that not only was Melvin unfit to stand trial but, even years later, he was still unfit to stand trial.

Neither the post-conviction court, nor the appeals court, however, gave any weight to Dr. Kavanaugh's opinion. The post-conviction court found that Melvin was fit to stand trial based on Melvin's correct answers to the court's yes or no questions at trial and the fact that Melvin was not "drooling" and his eyes were not "going someplace" (App. Ex. P, RP, at 17). The appellate court dismissed Dr. Kavanaugh's report as "irrelevant "holding that the question of whether there is a *bona fide* doubt as to Melvin's

---

[6] The trial judge in this case (who also presided over the post-conviction petition) was apparently operating under these same mistaken stereotypes about the mentally retarded when he found that Melvin was competent to stand trial because he was not "drooling" or his eyes were not "going someplace." (RP, at 17)

fitness must be based on "the facts known at the time of trial." (App., Ex. B at 11). These decisions were wrong both as a matter of law and fact.

Whether there is a reasonable probability that a defendant would have been found unfit is not based solely on evidence that is available to defense counsel at the time of trial. A court cannot simply ignore a post-conviction report of a professional who opines that a defendant may have been unfit at the time of trial. *See Burt v. Uchtman,* 422 F.3d at 570. Although a "contemporaneous inquiry into competence is preferable to a belated one," *Young v. Walls,* 311 F.3d 846, 848-49, the United States Supreme Court has repeatedly endorsed the use of evidence adduced after trial to determine if a defendant was competent to stand trial. *Id.,* citing *Pate v. Robinson,* 383 U.S. 375, 386-87 (1966); *Dusky v. United States,* 362 U.S. 402, 403 (1960). *See also, Galowski v. Berge,* 78 F.3d 1176, 1181 (7th Cir. 1996). Had the state courts considered Dr. Kavanaugh's opinion, not only would Melvin have established a "reasonable probability" that he would have been found unfit had a hearing been held, he would have established his unfitness to a "reasonable degree of psychological certainty." (C.L. 210, C.L. 560-577).

> **3.     This Court should hold an Evidentiary Hearing to Determine if Melvin was incompetent to stand trial and whether trial counsel was ineffective in failing to seek a competency hearing on his behalf**

Melvin Newman's post-conviction petition raised serious questions about the performance of his trial counsel and about Melvin's fitness to stand trial which were never answered by the state courts. For example, Melvin alleged that his trial counsel never visited him while he was in the juvenile detention center and that he did not explain to him the consequences of many of the trial related decisions he was called upon to make, including the two he made on the record – the decision not to testify and the

decision to forego a second degree murder instruction.   Melvin also claimed that his trial counsel coached him on how to answer the court's "yes" or "no" questions with a pre-arranged set of signals based on the number of time that counsel tapped his leg.   If true, such allegations not only reflect the fact that counsel knew the extent of Melvin's deficiencies, but also suggest that he tried to deceive the court about them.

With regard to Melvin's fitness to stand trial, several persons, including Melvin's family members and professionals who spent much more time with him than did trial counsel, reported that Melvin did not adequately comprehend his proceedings. Several remarked about how Melvin appeared to be confused about the length of his sentence – he thought he was going away for four to seven years instead of forty seven years – after he was convicted of first degree murder.   Dr. Kavanaugh's evaluation of Melvin also showed that he was essentially clueless about what was happening to him throughout the trial and remains so today.

These and other unanswered questions about Melvin's fitness and counsel's performance are too important to be left unanswered. The Constitution forbids the State from subjecting a person who is unfit to a trial. *Drope v. Missouri*, 420 U.S 162, 171 (1975). It is such a fundamental right that it cannot be waived. *See Cooper v. Oklahoma*, 517 U.S. 348, 354 n.4. citing *Pate v. Robinson*, 383 U.S. at 384. As the United States Supreme Court said in *Drope*, "competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Drope*, 420 U.S. at 171-172.

Where, through no fault of petitioner's, there is so much missing from the state courts' evaluation of petitioner's claims that the federal court cannot determine the reasonableness of the state courts' decision, the federal district court may need to conduct its own hearing and make its own findings. *Price v. Thurmer,* 514. F.3d 729, 733-734 (7th Cir. 2008) (requiring district court to hold hearing to determine if defendant who may have been insane and incompetent to stand trial was prejudiced by his trial counsel's mistakes). In order to safeguard the fundamental right of Melvin Newman to be tried while competent, and to ensure that this right was scrupulously honored by effective assistance of his trial counsel, this Court should do what the state courts have failed to do and what Justice Wolfson recognized that they should have done – conduct an evidentiary hearing to assess the extent of Melvin's disabilities, trial counsel's knowledge of them, and to evaluate trial counsel's performance in light of them.

### B. The State Courts Made Unreasonable Determinations of Fact Regarding Melvin's Fitness to Stand Trial

Under AEDPA. 28 U.S.C. § 2254(d)(2), a petitioner may also obtain habeas relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Although state court factual findings are entitled to deference, "even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review [and] [d]oes not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Indeed, if a state court's factual findings are "objectively unreasonable" no federal court deference at all is required. *Miller-El*, 537 U.S. at 340-41 (2003). A state court decision that rests upon a determination of fact that lies against the

clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable. *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003) citing *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997).

The role of deference is further relaxed where the state courts failed to hold a full and fair evidentiary hearing on petitioner's claims. "If ... a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004). *See also, Marshall v. Lonberger*, 459 U.S. 422, 434 (1983); *Julian v. Bartley*, 495 F.3d 487, 494 (7th Cir. 2007) (holding that habeas courts reviewing factual determinations made without a hearing are not as constrained in their review of state court credibility findings of witnesses); *Bryan v. Mullin*, 335 F.3d 1207, 1215-16 (10th Cir.2003), *cert. denied,* 541 U.S. 975 (2004) (declining to apply presumption where state court failed to hold an evidentiary hearing).

Finally, deference is not warranted where the state court has before it, yet ignores, evidence that supports petitioner's claim. *Miller-El*, 537 U.S. at 346 ("Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past.").

No deference is due the trial court's finding that Melvin was fit because he was not "drooling" or his eyes were not "rolling someplace" when he had conversations with the court. Although observations such as these of a defendant's demeanor may have

some relevance in certain cases, they have little or no relevance here. Melvin was
mentally retarded, not raving mad. He was not going to drool or roll his eyes. Mentally
retarded defendants, as a survival skill in a world that is intolerant of their disabilities, are
expert at masking their disabilities. *See e.g., Rivera v. Dretke*, Not Reported in
F.Supp.2d, 2006 WL 870927 * 12 n. 20 (S.D.Tex. 2006) (granting habeas petition on
*Atkins* grounds and noting expert testimony that "mentally retarded individuals often
attempt to mask their condition"), *affirmed in part, vacated in part, and remanded by
Rivera v. Quarterman* 505 F.3d 349, 363 (5th Cir. 2007) (affirming, *inter alia*, finding of
mental retardation).

In order for the court to have gauged the extent of Melvin's disabilities, it would
have had to have engaged in conversations with Melvin which required more than a "yes"
or "no" answer. Neither of the two colloquies in the record called for more than "yes" or
"no" answers. Although the trial court could not have known of Melvin's disabilities at
trial, the court was provided with a mountain of evidence of the defendant's mental
retardation and other disabilities on post-conviction. Faced with this evidence, the trial
court chose simply to ignore it. This is the essence of unreasonableness.

Similarly, no deference is due to the factual findings of the state appeals court
underlying its holding that Melvin failed to demonstrate that a *bona fide* doubt existed as
to his competency at the time of his trial. The Appellate Court cherry-picked four
statements out of pages and pages of reports to support its position: 1) a psychiatric
assessment from Hartgrove which stated that Melvin had "adequate intelligence" 2) a
CPS psychological evaluation where the assessor felt that Melvin's performance was
"invalid" and "not commensurate with past assessments" 3) a juvenile probation

department social investigation that did not indicate that Melvin had any difficulty in answering or understanding questions; and 4) the description from a special education teacher that Melvin was a good student who gave 100% every day in class. App., Ex. B at 9-10.

The Appellate Court's reliance on these four statements is misplaced. In doing so, the court either quoted reports out of context or relied on the reports of less competent professionals that downplayed the extent of Melvin's disabilities. For example, the fact that one of Melvin's special education teacher called Melvin "a good student" means nothing when one considers that teachers at the detention center are not allowed to fail students and give students like Melvin "A's for putting in the effort." *See* App. Ex. J, ¶15, C.L. 444. Similarly, a single statement by an attending physician at a psychiatric hospital that Melvin had "adequate intelligence" must be trumped by Melvin's failing school performance, his inability to read and write, repeated intelligence scores and psychological evaluations showing that he was mentally retarded, could not understand abstract concepts, had difficulty following multiple verbal requests, and had serious memory problems. The fact that one examiner believed one of Melvin's tests was "invalid" is trumped by numerous others who found his scores to be valid.

No deference is also due to the state court findings concerning Melvin's competency because the state courts – both the post-conviction court and the appeals court – made their factual findings without holding an evidentiary hearing on Melvin's claims and because they ignored the only evidence directly on point – the expert opinion of Dr. Kavanaugh that Melvin was not fit to stand trial and is still not fit. This again, is the essence of unreasonableness, and should lead this court to reverse the defendant's

conviction and grant his petition for habeas relief. *See, e.g., Julian v. Bartley*, 495 F.3d 487, 494 (7th Cir. 2007) (reversing district court's denial of 2254 petition raising ineffective assistance of counsel on grounds that state courts' unreasonably determined the facts because "[t]he state court simply ignored a key piece of evidence"); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (reversing district court's denial of 2254 petition alleging ineffective assistance of counsel on the grounds that state courts had made unreasonable determination of facts because state court findings were "inadequately supported by the record" and hence essentially "arbitrary"). *Cf. Benefiel v. Davis*, 357 F.3d 655, 660 (7th Cir. 2004), *cert. denied, Benefiel v. Davis*, 543 U.S. 979 (2004) (upholding district court denial of 2254 alleging incompetence to stand trial based on finding that state courts had made reasonable determination of fact because state court determinations were predicated on two pre-trial competency hearings featuring "testimony of psychological experts" and the defendant's own testimony at trial).

## **Conclusion**

WHEREFORE, for all of the reasons stated herein, Petitioner Melvin Newman respectfully requests that this Court issue a Writ of Habeas Corpus to vacate his unconstitutional convictions, hold an evidentiary hearing on this matter, or grant such other relief as may be appropriate and necessary to dispose of the matter as law and justice require.

Respectfully submitted,

One of Petitioner's Attorneys

Steven A. Drizin
Northwestern University School of Law
Bluhm Legal Clinic
357 E. Chicago Avenue
Chicago, IL 60611
(312) 503-6608
Attorney No. 15245