**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MELVIN A. NEWMAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 08-cv-4240 |
| | ) | |
| DONALD GAETZ, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Following his conviction for first degree murder, Melvin A. Newman filed a petition for a writ of habeas corpus. Newman contends that his trial counsel, attorney Michael Johnson, provided constitutionally inadequate representation by, among other things, failing to request a competency hearing prior to his trial. According to Newman, that inaction cannot be excused, because Newman was evidently mentally retarded and had an IQ in the "extremely low range." At a minimum, Newman maintains that he has offered evidence entitling him to an evidentiary hearing; the Court agrees.

Although his allegations must be tested in an adversarial proceeding, Newman makes a compelling *prima facie* case that his lawyer's representation fell below the constitutional minimum and that, as a result, Newman suffered prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (articulating the familiar two-part test for ineffective assistance of counsel claims). Therefore, under the pre-AEDPA hearing standards that govern in this case, Newman is entitled to an evidentiary hearing on his petition for a writ of habeas corpus.

**I.      Background**

Two .9 mm shell casings were recovered from the crime scene at 5652 South Wells Street in Chicago. That is where, in July 2001, Andy Dent was shot twice. The shooting brought to a close a

several-blocks-long confrontation. Sadly, the wounds proved at once decisive and fatal. One shot pierced Dent's left temple; the other found the middle of his chest. Newman was arrested and brought to trial, at which he maintained his innocence. According to a lawfully constituted jury, however, Melvin A. Newman pulled the trigger. He was sentenced to a term of 47 years behind bars.

After launching an unsuccessful direct appeal of the verdict, Newman mounted a similarly unsuccessful collateral attack on his conviction in state court. Using the procedures called for in the Illinois Post-Conviction Act (725 ILCS 5/122-1(a)(1)), he raised three arguments. Only one of those arguments is pressed in the federal case, so there is no need to recount the others here. The still-pressed argument was that his lawyer failed to investigate and raise the issue of Newman's fitness to stand trial, despite receiving a two-inch-thick stack of diagnoses and other records from Newman's mother and learning that Newman went to a "special school." One of the documents that allegedly found its way into the lawyer's hands was from the U.S. Social Security Administration, and it confirmed that Newman had been found disabled in 1995 on the basis of mental retardation. Pet'rs Ex. D, at 1. Another document, an evaluation from a psychologist, who admittedly equivocated a bit on her findings, stated that Newman had an IQ of 62, "yield[ing] a * * * national percentile rank of 1." Pet'rs Ex. G, at 3. On June 21, 2006, the trial court dismissed Newman's claims, without having held an evidentiary hearing.

The trial court's reasoning was set out in an oral ruling. See Pet'rs Ex. P ("June 2006 Order"). The trial court did not touch on Newman's ineffective assistance of counsel claim for very long, or in the right place. Rather than address whether it was unreasonable for Newman's lawyer to decline to investigate his client's mental condition, the trial judge primarily discussed whether there was enough information available to the *trial court* such that *it* should have held a competency hearing on its own motion. To the extent the trial judge made a finding that Newman was fit to stand trial (the second half

of the *Strickland* inquiry, discussed below), the court's conclusions were based on what might charitably be called popular heuristics:

> As to fitness, I personally had conversations with Mr. Newman; and I'm not inexperienced in this matter. And his responses were correct. *If he was drooling or if his eyes were going someplace, counsel, I assure you, I would have sua sponte asked for a fitness hearing.* His responses were appropriate. In fact, it wasn't a yes-or-no matter when I asked him about the second degree murder instruction. He replied no.[1]

June 2006 Order at 17-18 (emphasis added). See also Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 46 (4th ed. 1994) ("DSM-IV") (diagnostic criteria for mental retardation are (a) significantly subaverage intellectual functioning, (b) deficits in adaptive functioning in two of eleven specified areas, and (c) onset before age 18).

The trial court also seemed to have concluded, again without an evidentiary hearing, that Newman's most serious allegation was unfounded. The allegation, offered in support of his ineffective assistance of counsel claim, was that his lawyer devised a system of tapping on Newman's leg to indicate whether to answer yes or no to the judge's direct questions. In taking up the matter of percussive coaching, the trial court seemed to suggest that Newman's answer of "no" to a non-yes-or-no question was evidence that Newman had given "appropriate" responses. June 26 Order at 18. Newman's allegations, therefore, were "carrying it a little bit too far." June 26 Order, at 17-18. No witness was put on the stand, and his trial lawyer does not appear to have responded to the allegation even in a subsequently filed affidavit.

Newman appealed the decision to dismiss his petition without an evidentiary hearing to the Illinois Appellate Court; the appellate court affirmed the lower court. The court ruled that the "defendant has failed to demonstrate that a bona fide doubt as to [Newman's] fitness to stand trial

---

[1] Of course, answering "no" to a question that does not call for a yes-or-no answer does not obviously provide robust support for the proposition that Newman falls outside the mentally retarded range.

existed at the time of trial." *People v. Newman*, No. 1-06-1977, slip op. at 10 (Ill. App. Ct. Sept. 4, 2007). The Illinois Appellate Court's ruling makes clear that it did not address the question of whether his trial counsel's performance was constitutionally deficient, but rather it took up the issue of whether Newman suffered any prejudice as a result. Compare *id.* at 7 ("Where a defendant fails to show prejudice, the reviewing court need not determine whether the test of deficient performance was met"), with *id.* at 8-11 (reasoning that prejudice can be found only if there was, at the time of trial, *bona fide* doubt about fitness and concluding that no doubt about fitness existed). The court concluded that an expert report (the "Kavanaugh Report"), which indicated that Newman had an IQ within the "extremely low range" (meaning the 2.2 percentile), but which was prepared after Newman's trial, was "irrelevant" because the facts as they existed at the time of trial were what mattered. Justice Wolfson dissented, agreeing with Newman that sufficient evidence had been marshaled to warrant an evidentiary hearing.

Having completed the state-level, post-conviction process, Newman filed with this Court a petition for a writ of habeas corpus. He bases his petition on two grounds. The first ground is that the state courts unreasonably applied clearly established law concerning his competency to stand trial under the Fourteenth Amendment—and concerning his lawyer's ineffectiveness under the Sixth Amendment for failing to tug at that thread.[2] The second ground is that the state courts made unreasonable determinations of fact in finding that Newman was competent to stand trial and in finding that there was no *bona fide* doubt about his competency to stand trial at the time of his conviction.

## II. Analysis

### A. AEDPA and Evidentiary Hearings

---

[2] As noted *infra* Part III, Respondent argues that Newman has procedurally defaulted on any standalone due process claim based on his fitness at the time of trial, but the Court need not reach the question at this time, and possibly ever.

The starting point, and lodestar, for habeas review is the Antiterrorism and Effective Death Penalty Act of 1996, commonly known as "AEDPA" (Pub. L. No. 104-132, 110 Stat. 445 (1996)), which overhauled 28 U.S.C. § 2254. See also *Davis v. Lambert*, 388 F.3d 1052, 1058 (7th Cir. 2004) (habeas review is "governed in the first instance" by AEDPA). As amended, Section 2254 sets out the standards governing the treatment of habeas petitions filed by state prisoners. The statute provides that "a district court shall entertain an application for a writ of habeas corpus * * * only on the ground that he is in custody in violation of the Constitution or laws * * * of the United States." In order to show that he is entitled to a writ of habeas corpus, a petitioner must show that the state court either thoroughly botched clearly established law or misunderstood the evidence. In AEDPA phraseology, the state court's adjudication of a petitioner's case must have led to "a decision that was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent (28 U.S.C. § 2254(d)(1)) or must show that the state court's adjudication led to "a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in state court (28 U.S.C. § 2254(d)(2)). State courts commit legal error—2254(d)(1)—when they reach a conclusion on a question of law that is the opposite of the Supreme Court's conclusion, or if they take facts that are materially indistinguishable from a Supreme Court case and come out the opposite way. *Stock v. Rednour*, --- F.3d ----, 2010 WL 3447707, at *4 (7th Cir. Sept. 03, 2010). They commit factual error under (d)(2) when the decision reached necessarily is "so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008). In this case, Newman makes both a § 2254(d)(1) argument and a § 2254(d)(2) argument.

That is the general framework, but for a federal court reviewing a habeas petition, there is also a question as to the size of the factual universe. In the mine run of cases, habeas petitioners fail to develop the facts behind their arguments when they are still in state court. When that happens,

AEDPA's scheme is unforgiving; that statute limits a district court's discretion to order an evidentiary hearing in nearly all cases. 28 U.S.C. § 2254(e)(2)(A),(B) (evidentiary hearing available only for retroactive constitutional rulings, virtually undiscoverable information, or overwhelmingly favorable factual arguments such that "no reasonable factfinder" would have returned a guilty verdict). But when a petitioner has developed the factual basis for a claim, or where the state court denies an evidentiary hearing to a petitioner, the statute does not cabin the district court's discretion to order a hearing. "In these circumstances, [a petitioner's] eligibility for a hearing in federal court should be determined under pre-AEDPA standards." *Davis*, 388 F.3d at 1059; *Dalton v. Battaglia*, 402 F.3d 729, 736 (7th Cir. 2005) (AEDPA evidentiary-hearing standards do not come into play where the petitioner is "diligent in his attempts to develop the factual record in state court"). Under pre-AEDPA standards, an evidentiary hearing is required if (1) the habeas petitioner alleges facts that, if proved, would entitle him to relief and (2) the state court—for reasons outside of the petitioner's control—never considered the petitioner's claim in a full and fair evidentiary hearing. *Allen v. Buss*, 558 F.3d 657, 664 (7th Cir. 2009); *Matheney v. Anderson*, 253 F.3d 1025, 1039 (7th Cir. 2001).

In this case, the pre-AEDPA standards apply, so Newman is entitled to a hearing if he alleges facts that entitle him to relief and if the state court denied him a full and fair evidentiary hearing, for reasons beyond his control. The second part of that test is easily satisfied in this case: the failure to receive an evidentiary hearing occurs for reasons beyond the petitioner's control in cases where the petitioner unsuccessfully seeks an evidentiary hearing at every step of his state proceedings. *Ward v. Jenkins*, 613 F.3d 692, 701 (7th Cir. 2010) (citing *Jones v. Wallace*, 525 F.3d 500, 503 (7th Cir. 2008) (per curiam)); *Davis*, 388 F.3d at 1061; see also *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (teaching that diligence typically requires a petitioner seek an evidentiary hearing in state court "in the manner prescribed by state law"). In both his post-conviction proceeding and on appellate review of his post-

conviction proceeding, Newman requested an evidentiary hearing on his ineffective assistance of counsel claims. He pressed the argument that his lawyer failed to follow-up on information that indicated that his client may have been mentally retarded. Indeed, Newman's petition for post-conviction relief in state court made substantially identical arguments—and pointed to the same facts—as in his petition for habeas corpus. The meat of the allegations is explored in greater depth as they relate to the substantive standards for an ineffective assistance of counsel claim. See *infra* Part II.B.I. But the gist is that Newman's mother told Newman's attorney that he went to a "special school;" that she gave the lawyer medical records, psychological records, school evaluations, and other documents; and that among the records was a report indicating that Newman had an IQ of 62. Resp'ts Ex. 6 (state court post-conviction record), at C33-34. Although he properly presented the information to the post-conviction court and to the Illinois Appellate Court, the state courts declined to hold an evidentiary hearing. See Resp'ts Ex. 7, at 16 (Newman's post-conviction brief to the Illinois Appellate Court); Answer ¶ 4 (noting that the trial court did not hold an evidentiary hearing); see also *People v. Newman*, No. 1-06-1977, slip op. at 14 (Ill. App. Ct. Sept. 4, 2007) (Wolfson, J., dissenting) ("I would send the case back for an evidentiary hearing.").

So Newman never got an evidentiary hearing in state court, despite pressing for one. That means that whether he gets a hearing in federal court is a function of the substance of his allegations; if the facts as alleged paint a picture entitling him to relief, then he gets a hearing. The measuring stick for that inquiry starts with the Supreme Court's landmark decision in *Strickland v. Washington*.

### B.    *Strickland v. Washington* **and Step-2 of the Pre-AEDPA Evidentiary Hearing Inquiry**

Because the state courts, for reasons outside of Newman's control, never held a full and fair evidentiary hearing, Newman is entitled to an evidentiary hearing in federal court if he alleges facts that, if proved, would entitle him to habeas relief. *Matheney*, 253 F.3d at 1039. Figuring out if Newman has

made the right allegations requires plugging his arguments into the two-part framework of *Strickland v. Washington*, 466 U.S. 668 (1984), and its Seventh Circuit progeny. In *Strickland*, the Supreme Court held that a petitioner must establish two propositions to successfully make out a Sixth Amendment ineffective assistance of counsel claim.[3] Under the now-familiar formulation, a petitioner must demonstrate both (1) that his lawyer's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that the result of the proceedings would have been different, but for his counsel's "unprofessional errors." *Id.* at 694; see also *Ward,* 613 F.3d at 698.

### 1. Objective reasonableness.

Under *Strickland*'s first prong, a petitioner must show that his trial counsel's performance fell below an objective standard of reasonableness, which means that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Davis*, 388 F.3d at 1059. The "review of the attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quotation marks omitted). The standard formulation is lenient, but it is not self-defining, and there is no magic in tautology: one must look to case-law guideposts to see how bad a lawyer's advice must be before it violates the constitution.

The key case for present purposes is *Brown v. Sternes*, 304 F.3d 677 (7th Cir. 2002), in which the Seventh Circuit evaluated the sufficiency of a lawyer whose performance was substantially similar to the currently known facts about Newman's trial counsel.[4] In *Brown*, the petitioner was arrested and

---

[3] The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." The right to counsel "is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). When a lawyer provides objectively unreasonable advice—that which falls outside "the range of competence demanded of attorneys in criminal cases" (*Strickland*, 466 U.S. at 687)—a petitioner is denied his Sixth Amendment rights.

[4] The Court emphasizes that the facts at this time are based on Newman's allegations and supporting materials. Similar to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court takes the facts based on

convicted of armed robbery. Five years prior to his arrest, Brown had been incarcerated at the Menard Correctional Facility, where he was diagnosed with chronic schizophrenia and placed on numerous medications. He had applied for social security benefits, at which point he received another diagnosis of chronic schizophrenia. *Id.* at 680-81. When Brown was arrested on the armed robbery charge in 1991, his trial lawyer[5] did not know all the past details of Brown's medical history, but a credible source (faculty at Northwestern University Law School's legal clinic) told the lawyer that Brown had a history of mental illness. *Id.* at 682. Brown's lawyer did ask for a competency hearing, but did not pursue the underlying medical records with particular zeal, and the court-appointed experts did not seek the records either (despite being turned on to their existence and despite the integral nature of the records in diagnosing schizophrenia). *Id.* at 682, 696. The court-appointed psychiatrists found Brown competent, and the lawyer failed to object to the conclusory reports, to object to the judge's conclusion that Brown was competent, to inform the judge that Brown had received anti-psychotic medication, to inform the judge that Brown previously had been unfit to stand trial, and to inform the judge that communicating with Brown had been difficult. *Id.* at 684. When Brown raised a subsequent state-court petition for post-conviction relief, the trial court did not hold an evidentiary hearing and the Illinois Appellate Court affirmed, holding that there was "no compelling basis or reason for counsel to further investigate defendant's mental health condition." *Id.* 688.

The Seventh Circuit took issue with the Illinois Appellate Court's analysis and conclusion, calling the "reasoning and comments" of the court "alarming, confusing, and most surprising." *Brown*, 304

---

Newman's allegations, which have yet to be tested in an adversarial proceeding.

[5] Brown actually was represented by two different lawyers during the course of his case, but that does not matter for purposes of analyzing Newman's petition.

F.3d at 689. The Seventh Circuit concluded that the Illinois Appellate Court had unreasonably applied clearly established precedent under 28 U.S.C. § 2254(d)(1). Notably, the Seventh Circuit provided important guidance for other courts: "[W]here it will be apparent from * * * conversations with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will repay further investigation * * * then the failure to investigate will be ineffective assistance." *Id.* at 692; see also *id.* at 693 (teaching that attorneys have an obligation to explore readily available sources of evidence that might benefit their clients).

And *Brown* is not the only case from the Seventh Circuit, or from other circuits, teaching that a defense attorney provides ineffective assistance of counsel when he or she receives reliable information about a history of psychiatric problems, but fails to investigate the matter. See *Brown*, 304 F.3d at 693 (citing *Brewer v. Aiken*, 935 F.2d 850, 857-58 (7th Cir. 1991); *Eddmonds v. Peters*, 93 F.3d 1307, 1325-26 (7th Cir. 1996) (Flaum, J., concurring); *Seidel v. Merkle*, 146 F.3d 750, 755-56 (9th Cir. 1998); *Williamson v. Ward*, 110 F.3d 1508, 1517-18 (10th Cir. 1997); *Antwine v. Delo*, 54 F.3d 1357, 1367-68 (8th Cir. 1995); *Genius v. Pepe*, 50 F.3d 60, 61 (1st Cir. 1995); *Bouchillon v. Collins*, 907 F.2d 589, 597-98 (5th Cir. 1990); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989); *Hooper v. Garraghty*, 845 F.2d 471, 474-75 (4th Cir. 1988); *Profitt v. Waldron*, 831 F.2d 1245, 1248-49 (5th Cir. 1987)).

The allegations in this case merit a closer look and adversarial testing: like the counsel in *Brown*, Newman's lawyer is alleged to have known about diagnoses of a serious mental health condition and rested on his laurels. There also is evidence that Newman's lawyer experienced difficulty communicating with his client but failed to raise the matter with the trial court. Indeed, counsel in *Brown* actually did more than Newman's lawyer is alleged to have done, because the issue of competence was at least raised with the trial court, but the pursuit of the pertinent medical records was lackadaisical. Newman's lawyer, in contrast, did not have to go hunting. Newman's mother states that, after their first

meeting, she gave trial counsel a two-inch-thick envelope of medical and other records. Pet'rs Ex. C, at C427. The records included a Social Security Administration verification that Newman had been diagnosed as mentally retarded (Pet'rs Ex. D), a school psychologist's evaluation of Newman that pegged his IQ at 62 (Pet'rs Ex. G), and an Individualized Education Program Plan stating that Newman was learning disabled and read at a first-grade level when he was 16 (Pet'rs Ex. H, at C169, C172). To be sure, not every document repeats that Newman was found to be mentally retarded (*e.g.*, Pet'rs Ex. E (school evaluation stating that Newman was hospitalized with "Intermittent Explosive Disorder")), and the report that says Newman had an IQ of 62 also notes that the measurement was lower than in past tests (Pet'rs Ex. G, at C161-62 (discussing the older tests that used different scales and not explaining how the data translate)), but under the standard set out in *Brown*, the information would have stoked embers of curiosity in a reasonably competent attorney. *Brown*, 304 F.3d at 692-93.

Thus, Respondent's answer that low IQ does not by itself establish lack of fitness (Answer at 18) is only tangentially related to the legal question faced by the Court. While Respondent's argument is correct as far as it goes, *Strickland*'s first prong asks only what is objectively reasonable for an attorney to do when presented with information that his client is mentally retarded. Respondent elides the question. The Seventh Circuit cases in this realm, however, show that the absolute bare minimum for a lawyer in these circumstances is to investigate and learn facts that reasonably "quiet[] the misgivings." *Galowski v. Berge*, 78 F.3d 1176, 1180 (7th Cir. 1996). And in the absence of an explanation from trial counsel about what happened in this case, the Court must hold an evidentiary hearing rather than speculate on his behalf. See *Brown*, 304 F.3d at 691 (teaching that while courts should defer to reasonable explanations offered by trial counsel, it is not the task of courts to offer post-hoc rationalizations for their actions).

Moreover, even were the medical and diagnostic files not literally placed in the trial counsel's hands, the record presents a circumstantial case that any reasonably competent lawyer's antennae would

11

have twitched upon talking to Newman. Antennae twitching warrants investigation. *E.g., Galowski*, 78 F.3d at 1178 (trial counsel provided adequate counsel where he sought a psychological evaluation of his client after the client told the lawyer that his mind "had been goin [sic] 100 miles and hour" and that he did not "know what [was] going on" and just "seemed to want to get the matter over with"). For example, one of Newman's teachers from 2001—the year that Dent was murdered—says that Newman could not understand complex or abstract concepts and needed to have things put to him in simple terms. Pet'rs Ex. I, at C449. Another teacher who offered personalized instruction stated that Newman had the worst reading skills of anyone she taught, that he had memory problems, and that he talked to her about his legal case in a way that suggested a lack of understanding about the case. Pet'rs Ex. J, at C445. And Newman's post-conviction evaluation conducted by Dr. Antoinette Kavanaugh placed his IQ at between 35 to 70. The report further indicated that Newman had the listening skills of someone aged 4 years and 8 months, and concluded that his impairments would be obvious to one speaking with him in part because his limited vocabulary caused conversations to break down. Pet'rs Ex. O ("Kavanaugh Report"), at C569, C575-76. And make no mistake, the Kavanaugh Report is relevant evidence. As long as mental retardation generally persists in a relatively constant state (see DSM-IV, at 40 (noting that cognitive IQ "tends to remain a more stable attribute" than adaptive functioning)), a recent evaluation provides circumstantial evidence of what Newman's condition was like prior to his conviction. That is just hornbook evidence law—the distinction between circumstantial evidence and direct evidence. The Illinois Appellate Court's conclusion is different only in degree, not in kind, from concluding that DNA from a blood-laden crime scene is "irrelevant" because it does not tell you about the blood's characteristics *before* it was spilled. If Newman's condition was as obvious as his teachers and the Kavanaugh Report indicate, then the trial counsel, whose own affidavit says that he spoke with Newman "on many occasions about his case" [22-2], should have keyed in on that condition.

And, of course, Newman himself makes a serious charge indicating that his lawyer did know that Newman could not meaningfully assist in his own defense and sought to conceal that information from the trial court. Specifically, Newman states in an affidavit that his lawyer told him, before going "up in front of the Judge, 'You watch me, if I tap my leg once, say yes, and if I tap it twice, say no.'" Pet'rs Ex. K, at C422 (further stating that Newman followed the directions). If credited, the witness coaching would provide powerful circumstantial evidence that Newman's trial counsel looked the other way when faced with a client who could not fly solo in even rudimentary conversations.

Even holding to one side the allegation that Newman's trial counsel sought to conceal his client's mental deficiencies from the trial court, other lawyers have done more and still come up constitutionally deficient. For example (and although the case occurs in a slightly different context), in *Wilson v. Gaetz*, the Seventh Circuit ruled that a lawyer was constitutionally ineffective for getting an expert's evaluation on fitness, but failing to get an additional evaluation on the issue of the petitioner's sanity. The result was that a sanity defense was raised but that the single expert for the petitioner got carved up on the stand. On those facts, the Seventh Circuit held that counsel had afforded constitutionally inadequate legal advice, and the only issue for the district court was prejudice. 608 F.3d 347, 349-50, 356 (7th Cir. 2010) (remanding for an evidentiary hearing on *Strickland*'s prejudice prong).

Finally, the Court notes that although Respondent does not face head-on Newman's contention that he is entitled to an evidentiary hearing, Respondent did move to supplement the record with an affidavit by Newman's trial counsel. Among other things, the seven paragraph affidavit states: "Based on my numerous conversations with Melvin Newman, I was of the opinion that Mr. Newman was fit for trial. Melvin Newman was able to understand the nature of the proceedings and was able to assist me in his defense" [22-2, at 1]. As an initial matter, the supplementary affidavit cannot be enough for Respondent to stave off an evidentiary hearing, because the "evidence * * * remains free from cross-

examination." *Allen*, 558 F.3d at 664. More to the point, if Newman's trial lawyer does not have more than that to offer in response to Newman's allegation that his mother gave him a stack of medical diagnoses—and, again, put aside the allegation of percussive witness coaching—then the response will prove inadequate. Even conflicting *expert* opinions may make it objectively unreasonable for a lawyer to fail to investigate his client's mental condition. See, *e.g.*, *Eddmonds*, 93 F.3d at 1324 (Flaum, J., concurring). By the force of that reasoning, a lawyer who simply discounts an expert report on his own has a lot of explaining to do. And, of course, *Brown* warns against uncritical acceptance of "post-hoc, self-serving affidavits" by trial counsel that provide "blanket and general statements" such as the client was "[a]t all times * * * lucid and coherent" or that there was "no indication that [the client] did not understand the proceedings against him or could not cooperate with counsel." *Brown*, 304 F.3d at 688 (quotation marks omitted); see also *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club L.P.*, 34 F.3d 410, 415 (7th Cir. 1994) (Posner, J.) (district court did "a kindness" by lending even minimal weight to a "perfunctory affidavit"); but *cf. Dalton*, 402 F.3d at 735 (noting that even self-serving affidavits can create issues worthy of greater exploration).

Newman has presented more than sufficient evidence, for present purposes, that his mental retardation was brought to his trial counsel's attention, but that counsel simply ignored the evidence. If true, the lawyer provided constitutionally inadequate legal advice that may entitle Newman to habeas relief. *Brown*, 304 F.3d at 693 (state court adjudication upset under 2254(d)(1) as unreasonable application of *Strickland*). Although the Ninth Circuit made the observation in a different context, its observation is equally apt here: "[t]here is nothing strategic or tactical about ignorance * * * ." *Pineda v. Craven*, 424 F.2d 369, 372 (9th Cir. 1970).

2.      **Prejudice**.

Even if a lawyer's representation was objectively unreasonable, a habeas petitioner is not entitled to relief unless he can show that the attorney's deficient performance actually prejudiced the petitioner. *Strickland*, 466 U.S. at 687; *Eddmonds*, 93 F.3d at 1319. To make the required showing, the petitioner "must show that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added) (teaching that a reasonable probability means "a probability sufficient to undermine confidence in the outcome"). In this case, that means that Newman must be able to show that if his lawyer investigated his mental condition, Newman would have been adjudged unfit to stand trial. Illinois law attaches a presumption of fitness; a defendant is unfit if, "because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10; see also *Benefeil v. Davis*, 357 F.3d 655, 659 (7th Cir. 2004) ("It is well-settled that a defendant may not be tried unless he has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and * * * a rational as well as factual understanding of the proceedings against him.") (quoting *Dusky v. United States*, 362 U.S. 402 (1960)).

Respondent's answer does not address whether Newman is entitled to an evidentiary hearing, maintaining instead that the Illinois Appellate Court's determination that there was no prejudice was not unreasonable. Answer at 24. But the Kavanaugh Report indicates that Newman was not competent to stand trial at the time of his conviction. Specifically, the Kavanaugh Report states that Newman's limited intellectual ability "would have significantly interfered with his ability to assist in his defense and his [sic] understand the nature and purpose of the proceedings." Kavanaugh Report at C576-77. The report concludes: "It is my clinical opinion that Mr. Newman cannot and was not able to assist in his own defense." *Id.* at 577.

Because the standards for obtaining a pre-AEDPA evidentiary hearing require only that a petitioner allege facts that, if true, would entitle him to habeas relief (*Allen*, 558 F.3d at 664), the Kavanaugh Report is sufficient, at this stage, to show prejudice. Accordingly, Mr. Newman is entitled to an evidentiary hearing.

* * *

In *Brown*, the Seventh Circuit concluded its opinion with a scorching criticism of the systematic failures that ultimately landed the petitioner in federal court. Judge Coffey observed that "Brown's psychiatric illness was not given so much as a sideways glance" by those who were involved in handling and evaluating Brown's case. *Brown*, 304 F.3d at 699. Time will tell if Newman's facts parallel Brown's, but, if nothing else, Newman's condition warrants a closer look.

## III. Conclusion

One final matter merits brief attention. Respondent contends that Newman cannot maintain, as a freestanding basis for habeas relief, his argument that he was denied due process of law by being subject to trial while mentally unfit. The Court need not take up the matter, a thorny area of law, at this time. The Court will need to address the question of procedural default on the Fourteenth Amendment due process claim only if both (i) Newman is able to muster enough evidence that he was unfit to stand trial and (ii) Newman *cannot* show that his lawyer offered constitutionally ineffective counsel. If Newman satisfies both parts of the *Strickland* inquiry, then his due process claim will be redundant.

For the reasons set forth above Newman's request for an evidentiary hearing is granted. Counsel for the parties are directed to confer and submit by 10/12/2010 a joint status report advising the Court of (1) the anticipated witnesses at the hearing, (2) a "ballpark" estimate of the estimated length of the hearing, and (3) dates on which counsel and/or witnesses are *un*available for a hearing. (The

Court will assume that all other dates are in play.)  The Court will then set the hearing on the first date on which the parties and the Court are mutually available.

Dated:  September 21, 2010

_____
Robert M. Dow, Jr.
United States District Judge