**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES of AMERICA ex rel. | ) | |
| MELVIN A. NEWMAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 08-cv-4240 |
| | ) | |
| DAVE REDNOUR[1], Warden, | ) | Judge Robert M. Dow, Jr. |
| Menard Correctional Center, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Following a jury trial, Melvin Newman was found guilty of fatally shooting Andy Dent in July 2001 and sentenced to a 47-year prison term. After launching an unsuccessful direct appeal of the verdict, Newman mounted a similarly unsuccessful collateral attack on his conviction in state court. Using the procedures called for in the Illinois Post-Conviction Act (725 ILCS 5/122-1(a)(1)), he raised three arguments. Only one of those arguments is pressed in this federal case, so there is no need to recount the others here.

Newman's remaining argument is that his lawyer failed to investigate and raise the issue of Newman's fitness to stand trial, despite having received a two-inch-thick stack of diagnoses and other records from Newman's mother and learning that Newman went to a "special school." Those records included a document from the U.S. Social Security Administration ("SSA") confirming that Newman had been found disabled in 1995 on the basis of mental retardation.

---

[1] Warden Rednour has succeeded Donald Gaetz as Warden of the Menard Correctional Center, where Petitioner Newman is incarcerated, and thus Rednour is substituted as Respondent in this case pursuant to Federal Rule of Civil Procedure 25(d) and Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts.

Another document, an evaluation from a psychologist, stated that Newman had an IQ of 62, "yield[ing] a * * * national percentile rank of 1."

On June 21, 2006, the state trial court dismissed Newman's post-conviction claims without holding an evidentiary hearing. The Illinois Appellate Court affirmed in a split decision, with Justice Wolfson dissenting on the ground that Newman had made a substantial showing of a constitutional violation and thus was entitled to an evidentiary hearing. After exhausting his post-conviction remedies in the Illinois state courts, Newman filed a habeas corpus petition in federal court alleging ineffective assistance of counsel [1].

On September 21, 2010, this Court issued an Order [31] concluding that Newman had established a *prima facie* case that his lawyer's representation fell below the constitutional minimum and that Newman suffered prejudice as a result. Accordingly, the Court granted Newman's request for an evidentiary hearing, which it held in the spring of 2011 [60, 61]. A few weeks after the hearing, on April 4, 2011, the Supreme Court issued its decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), changing the landscape that applies to ineffective assistance of counsel habeas cases and limiting the circumstances in which district courts may hold evidentiary hearings and when they may consider evidence produced at those hearings.

At the time of the post-hearing briefing, there was considerable uncertainty in regard to the proper application of *Pinholster*. However, the Seventh Circuit's recent opinion in *Mosley v. Atchison*, 689 F.3d 838 (7th Cir. 2012), provided clear guidance to district judges on how to proceed in a habeas case in the post-*Pinholster* world. Applying *Mosley*, the Court first assesses whether Newman has properly established a case under § 2254(d) looking only at the record before the state court. If Newman is successful under § 2254(d), the Court then may consider the

additional evidence presented at the federal evidentiary hearing to determine whether Newman is entitled to relief.

## I.    Legal Standard

Federal courts are authorized to issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d), "federal courts are usually limited to deferential review of the reasonableness, rather than absolute correctness, of a state court decision." *Mosley*, 689 F.3d at 844.  For purposes of reasonableness review, "a state prisoner must show that the state court's ruling on a claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).  "Where the state court's decision is 'contrary to' federal law, that decision is not entitled to usual AEDPA deference and is therefore reviewed de novo with the reviewing court applying the correct legal standard." *Mosley*, 689 F.3d at 844 (citing *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005)).

Federal review of a claim governed by § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. "It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id*. at 1399. Therefore, under § 2254(d) "evidence later introduced in federal court is irrelevant." *Id*. at 1400. If, however, § 2254(d) does not bar relief, then an evidentiary hearing may be needed to determine if the petitioner is being held in violation of the Constitution. *Mosley*, 689 F.3d at 844 (citing *Pinholster*, 131 S. Ct at 1412 (Breyer, J., concurring in part and dissenting in part)).

## II.    Analysis

Newman claims that his trial lawyer rendered constitutionally ineffective assistance of counsel.  To succeed on that claim, Newman must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that he was prejudiced as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (establishing the familiar two-part "performance" and "prejudice" test for ineffective assistance of counsel claims).  Although in this case an evidentiary hearing was held before the Supreme Court decided *Pinholster*, the Court must decide whether the state court's decision was contrary to or an unreasonable application of federal law based only on the evidence available to the state court when it made its decision.  See *Mosley*, 689 F.3d at 644 n.1.

### A.    Section 2254(d)

#### 1.    *Post-Conviction State Court Proceedings*

Newman originally raised his ineffective assistance claim in state trial court pursuant to the Illinois Post-Conviction Act (725 ILCS 5/122-1(a)(1)).  The trial court denied Newman's claim in an oral ruling.  Rather than addressing whether it was unreasonable for Newman's

lawyer to decline to investigate his client's mental condition, the trial judge primarily discussed whether there was enough information available to the *trial court* such that *it* should have held a competency hearing on its own motion. To the extent that the trial judge made a finding that Newman was fit to stand trial, the court's conclusions rested on a simplistic rationale:

> As to fitness, I personally had conversations with Mr. Newman; and I'm not inexperienced in this matter. And his responses were correct. *If he was drooling or if his eyes were going someplace, counsel, I assure you, I would have sua sponte asked for a fitness hearing.* His responses were appropriate. In fact, it wasn't a yes-or-no matter when I asked him about the second degree murder instruction. He replied no.

June 2006 Order at 17-18 (emphasis added); compare Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 46 (4th ed. 1994) ("DSM-IV") (diagnostic criteria for mental retardation are (a) significantly subaverage intellectual functioning, (b) deficits in adaptive functioning in two of eleven specified areas, and (c) onset before age 18). No witness was called to testify in the state trial court, and Newman's trial lawyer does not appear to have responded to the ineffective assistance allegation even in a subsequently filed affidavit. The trial court suggested that Newman's answer of "no" to a question that did not call for a "yes" or "no" answer was evidence that Newman had given an "appropriate" response to the Court's question. June 2006 Order at 18.

Newman appealed the decision to dismiss his petition without an evidentiary hearing to the Illinois Appellate Court. In a 2-to-1 decision, the Appellate Court affirmed the lower court, ruling that the "defendant has failed to demonstrate that a bona fide doubt as to [Newman's] fitness to stand trial existed at the time of trial." *People v. Newman*, No. 1-06-1977, slip op. at 10 (Ill. App. Ct. Sept. 4, 2007). The Appellate Court did not reach the question of whether Newman's trial counsel's performance was constitutionally deficient; rather, it addressed only the issue of whether Newman suffered any prejudice as a result. Compare *id.* at 7 ("Where a

defendant fails to show prejudice, the reviewing court need not determine whether the test of deficient performance was met"), with *id.* at 8-11 (reasoning that prejudice can be found only if there was, at the time of trial, bona fide doubt about fitness and concluding that no doubt about fitness existed). The court concluded that an expert report (the "Kavanaugh Report"), which indicated that Newman had an IQ within the "extremely low range" (meaning the 2.2 percentile), but which was prepared after Newman's trial, was "irrelevant" because the facts as they existed at the time of trial were what mattered. In his dissenting opinion, Justice Wolfson expressed his view that Newman had "made a substantial showing of a constitutional violation" and thus should be entitled to an evidentiary hearing. *Id*. at 14.

### 2. Prejudice

The Court begins its analysis with the only prong of the *Strickland* test that the state appellate court addressed on the merits—prejudice. The Court reviews the Appellate Court's decision under the AEDPA and looks only at the state court record. *Pinholster*, 131 S Ct. 1388; *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) (explaining that the pertinent decision for review under the AEDPA is the last state court decision on the merits of the issue). Even if a lawyer's representation was objectively unreasonable, a habeas petitioner is not entitled to relief unless he can show that the attorney's deficient performance actually prejudiced the petitioner. *Strickland*, 466 U.S. at 687; *Eddmonds v. Peters*, 93 F.3d 1307, 1319 (7th Cir 1996). To make the required showing, the petitioner "must show that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added) (teaching that a reasonable probability means "a probability sufficient to undermine confidence in the outcome"). In this case, that means that

Newman must show that if his lawyer had investigated his mental condition, there is a reasonable probability that Newman would have been adjudged unfit to stand trial.

Illinois law attaches a presumption of fitness; a defendant is only unfit if, "because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10; see also *Benefiel v. Davis*, 357 F.3d 655, 659 (7th Cir. 2004) ("It is well-settled that a defendant may not be tried unless he has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and * * * a rational as well as factual understanding of the proceedings against him.") (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

In the Appellate Court, the panel majority held that Newman "failed to demonstrate that a *bona fide* doubt as to his fitness to stand trial existed at the time of the trial" and thus he "failed to satisfy the prejudice prong." *People v. Newman*, slip. at 10. In the context of a habeas petition governed by the AEDPA, this Court does not assess the adequacy of the state court's reasoning, but rather the reasonableness of its judgment. *Harrington*, 131 S. Ct. at 785 (2011). Relief will be available only when "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedent." *Harrington*, 131 S. Ct at 786.

Newman argues that, despite this high standard, the state court's decision was unreasonable under both § 2254(d)(1) and (2). Specifically, Newman argues that under § 2254(d)(1) the state court unreasonably applied *Strickland* and its progeny when, after deeming "irrelevant" an unrebutted expert opinion indicating that Newman was unfit to stand trial, it concluded that Newman was "nothing more than academically challenged and a slow learner." The Court agrees. The Appellate Court found that the Kavanaugh Report was "irrelevant"

because it was produced after the trial. But the Kavanaugh Report is relevant evidence—a court cannot simply ignore a post-conviction report of a professional who opines that a defendant may have been unfit at the time of the trial.[2] See *Burt v. Uchtman*, 422 F.3d 557, 570 (7th Cir. 2005). The Kavanaugh Report addresses in detail whether Newman was competent to stand trial at the time of his conviction. Specifically, after interviewing and performing tests on Newman and interviewing others who interacted with him at the time of his trial, Dr. Kavanaugh opines that Newman's limited intellectual ability "would have significantly interfered with his ability to assist in his defense and his [sic] understand the nature and purpose of the proceedings." Kavanaugh Report at C576-77. Kavanaugh also offers her "clinical opinion that Mr. Newman cannot and was not able to assist in his own defense." *Id*. at 77. The Appellate Court unreasonably refused to consider the Kavanaugh Report, which strongly supports Newman's argument that had his counsel conducted a proper investigation and raised the issue of Newman's mental deficits with the state trial court, there is a "reasonable probability" that Newman would have been unfit to stand trial. *Strickland*, 466 U.S. at 694; see also *Dusky v. United States*, 362 U.S. 402, 402 (1960).

Second, Newman argues that under § 2254(d)(2) the Appellate Court's factual determinations were unreasonable. Again, the Court agrees with Petitioner. The Appellate Court's opinion focused on selected statements out of a two-inch stack of reports, ignoring other statements that pointed toward a different conclusion. For instance, the records given to Newman's attorney indicated that Newman had a first-grade reading level, possessed an IQ of

---

[2]    As the Court noted in its previous opinion, as long as mental retardation generally persists in a relatively constant state (see DSM-IV, at 40 (noting that cognitive IQ "tends to remain a more stable attribute" than adaptive functioning)), a recent evaluation provides fairly strong circumstantial evidence of what Newman's condition was like prior to his conviction. The Illinois Appellate Court's conclusion is different only in degree, not in kind, from concluding that DNA from a blood-laden crime scene is "irrelevant" because it does not tell you about the blood's characteristics *before* it was spilled.

65, and had been declared mentally retarded by the SSA. As the most analogous Seventh Circuit case law holds, when key facts of record run contrary to the state court's conclusions but are not addressed in the court's decision, a major concern arises about the correctness of the disposition. See *Julian v. Bartley*, 485 F.3d 487, 494 (7th Cir. 2007) (reversing district court's denial of § 2254 petition raising ineffective assistance of counsel on grounds that state court's unreasonably determined the facts because "[t]he state court simply ignored a key piece of evidence"); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (reversing district court's denial of a § 2254 petition alleging ineffective assistance of counsel on the grounds that the state courts had made an unreasonable determination of facts because state court findings were "inadequately supported by the record" and hence essentially "arbitrary"). In sum, this Court concludes that the Appellate Court unreasonably overlooked critical evidence in the record in rejecting Newman's claim for post-conviction relief and issued an "inadequately supported" judgment that resulted in prejudice to Newman under § 2254(d)(1) and (2). *Id.*

### 3.  *Performance*

As mentioned above, the Illinois Appellate Court reached only the prejudice prong in its analysis and did not address the performance prong of *Strickland*. Accordingly, the Court reviews the performance prong de novo according to pre-AEDPA standards. See *Pinholster*, 131 S.Ct. at 1401 (noting that de novo standard applies when the "state court decision did not reach the question" presented by petitioner); *Sussman v. Jenkins*, 636 F.3d 329, 350 (7th Cir. 2011) ("As noted previously, the state appellate court did not address the merits of Mr. Sussman's allegations of deficient performance, but proceeded directly to the prejudice inquiry. Consequently, we review de novo Mr. Sussman's claim of deficient performance.").

The performance standard provides significant latitude for what qualifies as permissible attorney conduct, and a prisoner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted). If the prisoner identifies specific errors or omissions made by counsel, the court then must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. at 690.

In this case, Newman argues that his counsel was ineffective when he failed to investigate obvious issues relating to Newman's fitness for trial and ask the trial judge to conduct a competency hearing. Because the Seventh Circuit's decision in *Brown v. Sterns*, 304 F.3d 677 (7th Cir. 2002), arose in similar circumstances, it is instructive in evaluating Newman's claim. In *Brown*, the petitioner was arrested and convicted of armed robbery. Five years prior to his arrest, Brown had been incarcerated at the Menard Correctional Facility, where he was diagnosed with chronic schizophrenia and placed on numerous medications. He also had applied for Social Security benefits, at which point he received another diagnosis of chronic schizophrenia. *Id*. at 680-81. When Brown was arrested on the armed robbery charge in 1991, his trial lawyer did not know all the past details of Brown's medical history, but a credible source (faculty at Northwestern University Law School's legal clinic) told the lawyer that Brown had a history of mental illness. *Id*. at 682. Brown's lawyer did ask for a competency hearing, but did not pursue the underlying medical records with particular zeal, and the court-appointed expert psychiatrists did not seek the records either (despite being advised of their existence and the integral nature of the records in diagnosing schizophrenia). *Id*. at 682, 696. After the experts opined that Brown was competent, his lawyer failed (1) to object to the experts' conclusory

reports, (2) to object to the judge's conclusion, (3) to inform the judge that Brown previously had been declared unfit to stand trial in a different case, and (4) to inform the judge that communicating with Brown had been difficult. *Id.* at 684.

When Brown filed a petition for post-conviction relief, the state trial court declined to hold an evidentiary hearing. The Illinois Appellate Court affirmed, holding that there was "no compelling basis or reason for counsel to further investigate defendant's mental health condition." *Brown*, 304 F.3d at 688. The Seventh Circuit took issue with the Illinois Appellate Court's analysis and conclusion, calling the "reasoning and comments" of the court "alarming, confusing and most surprising." *Brown*, 304 F.3d at 689. The Seventh Circuit concluded that the state court had unreasonably applied clearly established precedent under 28 U.S.C. § 2254(d)(1). The Seventh Circuit then explained that "where it will be apparent from * * * conversations with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will require further investigation * * * then the failure to investigate will be ineffective assistance." *Id.* at 692; see also *id.* at 693 (noting that attorneys have an obligation to explore readily available sources of evidence that might benefit their clients).

More recently, in a slightly different context, the Seventh Circuit in *Wilson v. Gaetz* ruled that a lawyer was constitutionally ineffective for obtaining an expert's evaluation on fitness, but failing to obtain an additional evaluation on the issue of the petitioner's sanity. 608 F.3d 347, 349-50, 356 (7th Cir. 2010). In that case, the defendant did raise a sanity defense, but the expert called to testify on his behalf was "taken apart in cross-examination" by the prosecutor who forced the expert to concede that only three paragraphs of his 14-page fitness report concerned the defendant's mental state when he had committed the murder (the rest of the report was about

the defendant's fitness during the expert's interview). *Id.* at 350. On those facts, the Seventh

Circuit held that defense counsel performed deficiently in presenting the insanity defense and

remanded to the district court for an evidentiary hearing on the prejudice prong of the ineffective

assistance claim. 608 F.3d 347, 349-50, 356 (7th Cir. 2010).

As demonstrated in the cases discussed above, and reaffirmed in those cited below, the

principle that a defense attorney provides ineffective assistance of counsel when he or she

receives reliable information about a history of mental deficiencies but fails to investigate the

matter and to seek a competency hearing if facts revealed during counsel's investigation indicate

an issue for judicial determination is well established in the law of the Seventh Circuit and

beyond. See *Brown*, 304 F.3d at 693 (citing *Brewer v. Aiken*, 935 F.2d 850, 857-58 (7th Cir.

1991)); *Eddmonds v. Peters*, 93 F.3d 1307, 1325-26 (7th Cir. 1996) (Flaum, J., concurring) (in

death penalty case, "counsel's decision not to initiate an investigation that was clearly called for

by the evidence was not supported by reasonable professional judgment"); *Seidel v. Merkle*, 146

F.3d 750, 755-56 (9th Cir. 1998) (petitioner was denied effective assistance of counsel by his

trial attorney's deficient performance in failing to conduct any investigation into extent or

possible ramifications of defendant's psychiatric impairment); *Williamson v. Ward*, 110 F.3d

1508, 1517-18 (10th Cir. 1997) (concluding that defense counsel was ineffective in failing to

investigate defendant's mental illness and seek competency hearing); *Genius v. Pepe*, 50 F.3d

60, 61 (1st Cir. 1995) (finding counsel's failure to investigate a possible complete defense as "an

extraordinarily unbalanced choice," regardless of whether counsel made the decision

deliberately—as to which there was no evidence—or by default, particularly when there was

evidence of a mental disturbance in the record); *Bouchillon v. Collins*, 907 F.2d 589, 597-98 (5th

Cir. 1990) ("It must be a very rare circumstance indeed where a decision not to investigate would

be 'reasonable' after counsel has notice of the client's history of mental problems"); *Profitt v. Waldron*, 831 F.2d 1245, 1248-49 (5th Cir. 1987) (concluding that petitioner's trial counsel was ineffective in failing to investigate prior mental history for insanity defense). The question is whether the performance of Newman's counsel in this case fell below the minimum constitutional threshold articulated in these cases.

Returning to the facts in this case, the evidence before the state court showed that Newman's lawyer, Michael Johnson, was aware of multiple diagnoses of a serious mental health condition as well as information that his client may have been mentally retarded. There also is evidence that Johnson experienced difficulty communicating with his client but failed to raise the matter with the trial court. Indeed, it appears that counsel in *Brown* actually exerted greater effort on his client's behalf than Johnson did; in *Brown*, counsel at least raised the issue of competence with the trial court, although counsel's pursuit of the pertinent medical records was lackadaisical. Johnson, by contrast, would not have had to do much investigating, if any, to determine that Newman had severe mental deficits. Newman's mother stated that, after her first meeting with Johnson, she gave him a two-inch-thick envelope of medical and other records – which Johnson acknowledges receiving. The records included an SSA verification that Newman had been diagnosed as mentally retarded, a school psychologist's evaluation of Newman that pegged his IQ at 62, and an Individualized Education Program Plan stating that Newman was learning disabled and read at a first-grade level when he was 16. To be sure, not every document repeats that Newman was found to be mentally retarded. For instance, the school evaluation states that Newman was hospitalized with "Intermittent Explosive Disorder," and the report that concludes that Newman had an IQ of 62 also notes that the measurement was lower than in past tests. There was, however, more than enough information making it clear that Newman had a

13

history of serious mental deficiencies. *Brown*, 304 F.3d at 692-93. The Seventh Circuit cases in this realm instruct that the absolute bare minimum for a lawyer in these circumstances is to investigate and learn facts that reasonably "quiet[] the misgivings." *Galowski v. Berge*, 78 F.3d 1176, 1180 (7th Cir. 1996). Newman's attorney, however, did very little to follow up on the red flags that had been raised for him.

Moreover, even if the medical and diagnostic files had not literally been placed in Newman's counsel's hands, the record presents a strong circumstantial case that any reasonably competent lawyer would have been aware that Newman had severe cognitive issues immediately upon speaking with him. *E.g., Galowski*, 78 F.3d at 1178 (trial counsel provided adequate counsel where he sought a psychological evaluation of his client after the client told the lawyer that his mind "had been goin [sic] 100 miles and hour" and that he did not "know what [was] going on" and just "seemed to want to get the matter over with"). For example, one of Newman's teachers from 2001—the year that Dent was murdered—said that Newman could not understand complex or abstract concepts and needed to have things put to him in simple terms. Another teacher who offered personalized instruction stated that Newman had the worst reading skills of anyone she had taught, that he had memory problems, and that he talked to her about his legal case in a way that suggested a lack of understanding about the case. Furthermore, Newman's post-conviction evaluation conducted by Dr. Antoinette Kavanaugh placed his IQ between 35 and 70. The report indicated that Newman had the listening skills of someone aged 4 years and 8 months and concluded that his impairments would be obvious to one speaking with him in part because his limited vocabulary caused conversations to break down. Because Newman's condition was obvious to his teachers and Dr. Kavanaugh, it is not a stretch for the Court to conclude that trial counsel, whose own affidavit says that he spoke with Newman "on

14

many occasions about his case" [22-2] and "who was in the best position of any lay person to evaluate [Newman's] competence" (*Galowski*, 78 F.3d at 1186), at least should have investigated to a far greater degree than he did. *E.g., Galowski*, 78 F.3d at 1180.[3]

Taking into consideration all of the evidence available to the state court at the time of the post-conviction proceedings, the Court finds that Attorney Johnson failed to fulfill his duty to investigate his client's fitness. Consequently, Johnson's performance fell below an objectively reasonable standard, as required in *Strickland*, and Newman has met his burden as to both performance and prejudice under § 2254(d).

**B.     Section 2254(a)**

Because the Court concludes that the state court decision denying Newman relief was contrary to or an unreasonable application of federal law, the Court now must determine whether under § 2254(a) Newman is in custody in violation of the Constitution or law or treaties of the United States. See *Mosley v. Atchison*, 689 F.3d 838, 853-54 (7th Cir. 2012) (quoting *Pinholster*, 131 S. Ct. at 1412 (2011) (Breyer, J., concurring in part and dissenting in part)). In making this second determination, the Court may consider the evidence presented during the evidentiary hearing in March 2011. *Id.*

*1.     Federal habeas proceedings*

---

[3] In addition to the evidence discussed above, Petitioner also contends that Johnson knew that his client could not meaningfully assist in his own defense and sought to conceal that information from the trial court. Specifically, Newman alleges that Johnson told him, before going "up in front of the Judge, 'You watch me, if I tap my leg once, say yes, and if I tap it twice, say no.'" Johnson vigorously denies that any such "leg tapping" incident took place. This allegation pits the testimony of Melvin and Barbara Newman against Attorney Johnson's testimony, without any additional corroborating evidence. There is no suggestion that Barbara Newman was privy in advance to any such plan, so her testimony would rest on conjecture from what she observed in the courtroom on the day of the hearing in question. The Court finds Attorney Johnson's version of events more likely to be the accurate one, for it is unlikely that such a charade would have gone unnoticed by the trial judge or opposing counsel. But even without considering any evidence that counsel tried to conceal Newman's mental deficits from the trial judge, there is ample evidence of inadequate investigation on Johnson's part.

Over the course of the evidentiary hearing, Newman put forward additional evidence in support of his claim that his counsel was ineffective when he failed to investigate Newman's fitness for trial and request a competency hearing. While there was an abundance of testimony presented and evidence produced, the relevant evidence and testimony can be summarized as follows.

Daphne Whitington testified that she was a literacy specialist who worked with Newman at the Audy Home, the juvenile facility at which Newman stayed during his trial from 2001-2002.[4] To be sure, Respondent's comment that the Court should take Whitington's testimony "with a grain of salt" is not unfounded. Whitington obviously has a teacher's fondness for a student who—by Whitington's lights—struggled despite trying hard. She also plainly feels badly for Newman given his current incarceration and his limited mental abilities. While cognizant of Whitington's sympathy for Newman, the Court nevertheless found her testimony credible, largely because it was consistent with (1) the observations of others who interacted with Newman near the time of his trial and conviction and (2) the written record of his mental abilities and challenges at that time.

According to Whitington, despite the fact that Newman "came every day ready to work," her progress was "slower with him than with almost any other student" she had ever worked with, because "things that he seemed to have mastered the day before, he would have forgotten by the next day." Ultimately, despite daily literacy instruction for a year from a highly acclaimed teacher, Newman was able to achieve only a kindergarten-level reading ability by the time he was convicted. Moreover, Whitington found that Newman had general cognitive delays that were readily apparent: he could not talk about abstract concepts and was easily lost by

---

[4] Whitington left the Audy Home in August of 2002. She received the Milken National Educator Award in 2007, in recognition of her success teaching literacy to special education students.

concepts such as justice.  He also was unable to comprehend the role of the defense attorney and the prosecutor and unable to respond when Whitington asked him about his own trial.[5]

Dan Dillon, another one of Newman's special education teachers at the Audy Home, reported similar troubles.[6]  Dillon testified credibly that Newman was "one of the lowest students" he had ever taught and that he was unable to read or spell simple four-letter words. Dillon also testified, like Whitington, that Newman was unable to retain whatever minimal academic progress he made from day-to-day.  Dillon further testified that based on his experience teaching Newman, he did not believe that Newman could have understood phrases used by the Judge during the trial including: "constitutional right to testify," "inference," "consulting," "second degree murder request," and "second degree murder jury instruction."

Jerry South, Newman's special education teacher at Menard, testified that when Newman arrived at the prison after his trial, he was functionally illiterate, could not tell time, and was unable to do basic arithmetic.  In February 2004, shortly after arriving at the prison, Newman was tested by a team of psychologists and teachers, who diagnosed him as suffering from "mental retardation"—a diagnosis that South, who participated in the development of the testing process, found to be consistent with his observations of Newman.  In sum, the testimony of all three teachers who worked with Newman shortly before and shortly after his trial paints a consistent picture of Newman as a person with significant and obvious mental impairments.  The records made available to defense counsel further support that view.

---

[5] Apart from pointing out a potential bias based on Whitington's obvious sympathy for her former student, Respondent's criticisms of Whitington's testimony largely miss the mark.  The fact that she gave more detailed testimony as a live witness than as an affiant on a prior occasion does not undercut the weight of her descriptions of Newman's mental functioning at the time that he was her student, particularly in view of the consistency between those observations and the recollections of others both at the Audy Home and Menard Correctional Center.

[6] Dillon has been teaching special education for more than twenty-five years.

Petitioner Melvin Newman also testified at the evidentiary hearing. In the years since his conviction, Newman has shown improvement—at age 26, he now has a reading level of a sixth-grader. But according to Newman, at the time of his trial he struggled to comprehend the court's instructions and the roles of the different parties—state's attorney, his attorney, and the judge. He testified that he did not understand courtroom procedures, or phrases such as "constitutional right," "consult with attorney," "inference," or "degree"—all terms that were used by the trial judge in colloquies with Newman. Even as of the time of the federal evidentiary hearing, several years removed from his trial and with the benefit of further education and development, it was evident that Newman lacked the mental abilities of even the least sophisticated witness of normal mental capacity.

Attorney Johnson was called to testify at the evidentiary hearing. The opportunity to see and hear from Johnson was valuable in that the charges leveled against him by his former client raise important issues that turn at least in part on credibility determinations. In hearing Johnson's side of the story and watching his demeanor as he testified, the Court was left with the impression that Johnson's shortcomings were not malicious. Rather, his deficiencies in representing Newman sprung from a failure to appreciate what should have been evident from sources within his grasp at the time of trial, including (1) what had been said to him about Newman, (2) what the available records revealed about Newman, and (3) his interactions with Newman himself. On the last point, by almost all accounts, Newman's mental shortcomings would have been readily apparent from any prolonged engagement with Newman on any subject of seriousness or gravity—of which a murder trial certainly is an example.[7] Thus, weighing

---

[7] As noted above, it was evident to the Court on the basis of its one opportunity to observe Newman in person during the evidentiary hearing—and especially during his testimony—that Newman's mental acuity is noticeably lower than any other witness who has testified at any proceeding over which the undersigned judge has presided.

Attorney Johnson's credibility at the evidentiary hearing along with the other evidence presented, the reasonable conclusions to draw from the factual record include the following: (1) Johnson represented Newman at a very busy time in his professional career, (2) even if Johnson previously had represented clients with mental disabilities, he had neither spent enough time with the records nor with Newman to recognize that Newman fit into that category as well, and (3) Johnson accordingly never realized that he could not treat the Newman case like the routine cases that he handled on a high volume basis at the time of Newman's trial.

Notably, there is neither any tangible evidence nor any recollection by lawyer, client, or anyone else of any meeting between Johnson and Newman that took place anywhere other than in the "pen" (a holding area adjacent to the courtroom where defendants in custody are placed prior to being brought into court) or in the courtroom itself contemporaneously with a scheduled court hearing. That suggests that Johnson never had a lengthy, private meeting with his client either to explore potential leads, trial strategy, or competence issues. True, Johnson met with Barbara Newman on many occasions and it would not be accurate to say that Johnson did nothing to prepare for trial or try to comprehend at least some of the records in his possession.[8] But even if the Court were to accept his recent statement recalling some "concerns" about

---

[8] The Court also heard testimony from Barbara Newman, who is Petitioner Melvin Newman's mother. As Respondent observes, because Ms. Newman "is a devoted mother" who wants to aid her son, the Court views her testimony cautiously. Yet, as Petitioner points out, many of the historical facts to which Ms. Newman testified are corroborated by independent sources and records, which enhances the credibility of her recollections. To be sure, it is evident that Ms. Newman consciously tried to avoid referring to her son as "mentally retarded," preferring instead to characterize him as "special" when alluding to his mental challenges and deficits. But it is not disputed that she provided Attorney Johnson with a large quantity of documents that set forth in a more direct manner than Ms. Newman would have the kinds of observations and diagnoses that should have tipped Johnson off to the need to investigate his client's fitness for trial. Thus, even if Barbara Newman was overly circumspect in describing her son's mental abilities to her lawyer, her description of Melvin as "special" along with the documents that she provided to Johnson cannot be said to have "throw[n] [Johnson] off the scent," nor can her actions have reasonably "closed off" a path of inquiry that Johnson should have taken. See *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998).

Newman's fitness and disregard the absence of any evidence that he ever voiced any such concerns prior to the filing of the federal habeas case, the concrete actions that Johnson took to "quiet" those concerns (*Galowski*, 78 F.3d at 1180) were plainly inadequate under circuit law.

For instance, the record contains precious little to support Johnson's vague recollections of what he *may* have done to investigate the red flags in Newman's records. Given the lapse of time since the trial, the absence of mental recollection is not as surprising as the dearth of any corroborating materials from Johnson's files. Moreover, Johnson's speculation as to certain doctors with whom he may have consulted (including Drs. Schwartz, Smith, and Guttman) and certain diagnoses that he may have considered (such as intermittent explosive disorder) was convincingly undercut by the interviews and research of Newman's counsel. And again accepting at face value Johnson's 2011 recollections that he considered Newman's grades and his acceptance into the Lincoln's Challenge program[9] as counterindicators to the notations in the records of mental retardation and other profound mental challenges, those counterindicators were not nearly strong enough to excuse further investigation of the red flags, which was not done in any meaningful way. At the end of the day, the best that can be said for Attorney Johnson is that he either hoped or guessed that Newman was fit to stand trial, but failed to take a number of reasonable (and readily available) steps to actually investigate whether that was so—and, following from that inaction, he failed to alert the state trial court to Newman's mental deficits so that a judicial fitness determination could be made.

Finally, the Court heard testimony from competing experts, Dr. Antoinette Kavanaugh, a psychologist who evaluated Newman in 2005, and Dr. Stafford Henry, a psychiatrist retained by

---

[9] Lincoln's Challenge Academy essentially is a youth intervention program that attempts to teach life skills to at risk students using a military model. Johnson testified that based on his familiarity with the program, a person with a serious mental deficit would not have been accepted into Lincoln's Challenge.

the State who evaluated Newman in 2010. Both experts have appropriate (and impressive) qualifications and both provided useful insights in their testimony.

Dr. Kavanaugh testimony largely tracked the opinions in her expert report—which were discussed in detail above. She noted that Newman's cognitive deficits were apparent within minutes of meeting him and that he was unable to define important legal concepts like "witness" and "evidence" or give meaningful definitions of the roles of the judge, jury, and state's attorney. Ultimately, Kavanaugh testified that, after considering her two interviews with Newman, her reviews of the records in this case, the tests she administered to him, interviews with other individuals who knew Newman at the time of his trial, Johnson's interactions with Newman, and Newman's inability to understand basic legal concepts, she concluded that Newman was not competent to stand trial in 2002. She further opined that Newman was mildly to moderately retarded and that his cognitive deficits would have been readily apparent to others at the time of trial.

Dr. Henry, a forensic psychiatrist for more than fifteen years who met with Newman for approximately two hours more than eight years after trial, reached a very different conclusion than Kavanaugh. Henry's approach was to openly challenge Newman during their two-hour session when he believed that Newman was lying. Henry opined that Newman was fit to stand trial in 2002 and was a malingerer—in other words, Henry believed that Newman has been feigning his deficits. He also testified that Newman gave accurate answers to questions about his trial, thus demonstrating an understanding of the process.

Deciding which expert has the better assessment of Melvin Newman and, in particular, Newman's fitness to stand trial as of 2002, is a difficult task. On balance, however, the Court is more persuaded by Dr. Kavanaugh's evaluation, as it was more rigorous and comprehensive and

took place much closer to the actual event in question—Newman's 2002 trial. Kavanaugh conducted two interviews of Newman over a three-week period in 2005. During those interviews, she probed his basic cognitive skills, his ability to understand and comprehend matters relating to his trial and conviction, and his ability to retain information from one interview to the next. Most tellingly for present purposes, Kavanaugh determined that Newman was completely unable to explain what took place during to colloquies at trial when he waived his right to testify and his right to a second-degree murder instruction. If Newman could not articulate the aspects of the trial where he had not only the advice of counsel, but the added protection of the Court's interposition and inquiry, it is difficult to imagine how he would have understood other critical aspects of the trial that unfolded without that additional safeguard.[10] Finally, given that she was conducting a retrospective analysis, Kavanaugh sensibly interviewed others who had known Newman around the time of his trial.

Respondent argues that the Court should credit Dr. Henry's opinions over Dr. Kavanaugh's principally on the ground that Dr. Henry is far more experienced at conducting fitness evaluations than Dr. Kavanaugh is. If all other things were equal, the Court might be inclined to use cumulative experience as a tie-breaker, even though Dr. Kavanaugh's credentials and experience are substantial. But, as noted above, all things are not equal in regard to the experts' work in this case. To be sure, Dr. Henry is highly credentialed and he offered a comprehensible summation of the bases for his opinions. But when placed against the full record

---

[10] The Court's confidence in its conclusions about Newman's lack of comprehension of his predicament at the time of his trial—including the level of his understanding of his trial rights and the limited degree to which he was able to assist counsel in mounting a defense—is reinforced by Johnson's admission that he never tried to explain to Newman the respective roles of the judge, jury, or prosecutors, nor did he explain to Newman how much time he might spend in prison if he were convicted of the charges. In any event, even if Johnson had explained various aspects of the trial, given his lack of appreciation of Newman's cognitive deficits, it is unlikely that Newman would have understood because the language Johnson would have used (as reflected in his testimony at the evidentiary hearing) was, in Kavanaugh's well-supported opinion, far too complex.

of documents and testimony in this case, Dr. Henry's conclusion that Newman is a malingerer who has been feigning his deficits—made after a single two-hour session with Newman eight years after the critical events took place—strikes the Court as conclusory and even abrupt.

The parties have argued the relative merits of Henry's confrontational approach against Kavanaugh's attempt to build rapport with her interviewee. In the Court's view, Kavanaugh's suggestion that Henry might have first tried building rapport with Newman before engaging in cross-examination of his answers has a certain common sense appeal, especially given that Henry was conducting his examination from the distance of eight years and had never previously met Newman. But Henry is an experienced professional, so the Court will not second guess his approach to interviewing Newman. What Henry's opinion lacks, however, is support from other people who knew Newman in the relevant time frame or from documents in the record.

Henry's assessment of Newman as a malingerer stands as an outlier among the views of the many individuals who have worked with Newman over the time frame—more than a decade—encompassed within the record of this case. While some of those individuals, most notably Whitington, may have become so attached to Newman that their views must be taken "with a grain of salt," others who have had no role in the development of the habeas case—most notably Newman's teachers in Chicago both before and after he was in custody as well as prison officials at Menard and Macon—reported cognitive deficiencies despite what they perceived to be Newman's best efforts. In view of these reports in the record, the Court cannot help but conclude that while Henry's two-hour examination of Newman in 2010 might have been the start of a comprehensive analysis leading to the conclusion that Newman is a malingerer, far more investigation, analysis, and confirmation would be needed before the Court could accept that opinion over the opposite inference that is supported by the rest of the evidence. To be sure,

Henry testified that he did consult collateral documents, even if he did not interview any other individuals. Still, on balance, Kavanaugh's opinion rested on a more thorough study that was undertaken much closer to the trial and took into account a more diverse range of documents and viewpoints than Henry's, and thus the Court credits Kavanaugh's conclusion that Newman was not fit to stand trial over Henry's view that he was.

2. *Performance*

In assessing the totality of the record against the pertinent legal standards, the Court begins with the first prong of *Strickland*—whether the performance of Newman's attorney was deficient when he failed to ask for a competency hearing. The State argues that Johnson took the appropriate steps to quell any doubts that he may have had as to Newman's fitness and therefore his performance was sufficient. However, looking at the testimony and evidence presented at the federal evidentiary hearing, as well as the parties' briefs, the Court concludes that Johnson's failure to conduct further investigation in light of the information at his disposal amounted to deficient performance under *Strickland*.

First, the Court finds that Johnson performed deficiently when he failed to follow up on the red flags contained within documents in his possession, which in all likelihood would have confirmed his "concerns" about Newman's fitness for trial and led him to call those concerns to the court's attention. Specifically, when Newman's mother, Barbara Newman, handed Johnson a stack of records detailing Newman's mental limitations—including a diagnosis of "mentally retarded" by the SSA—and told Johnson that Newman went to a "special school," Johnson had a duty to investigate. See *Brown*, 304 F.3d at 692 (7th Cir. 2002) (counsel's "failure to investigate will be ineffective assistance" when it is apparent from "sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will repay further

investigation"); *Strickland v. Washington*, 466 U.S. 688, 691 (1984) (not any investigation will suffice; rather counsel is obligated to conduct "reasonable investigations or to make reasonable decision that makes particular investigations unnecessary"). Any investigation that he did—the scope of which remains uncertain given his vague testimony and non-existent corroborating evidence—fell far short of what is required of counsel in circumstances like these.

Respondent's arguments that (1) Johnson's doubts were put to rest when he met with Newman at the Audy Home and (2) that Johnson was capable of making the determination because he had experience representing other mentally compromised defendants fall short for multiple reasons. To begin with, Johnson's testimony concerning his meetings with Newman is unconvincing because it rests solely on his recollection; there simply is nothing in the record to corroborate the meetings that Johnson claims to have had with Newman. See *Brown*, 304 F.3d at 688 (warning against the acceptance of "post-hoc, self-serving" claims from attorneys during ineffective counsel proceedings). Second, regardless of how many times Johnson actually met with Newman in the months leading up to trial, none of Johnson's descriptions of their meetings explain how his interactions with Newman quieted his doubts or how Johnson was qualified to make the medical determinations that he now claims to have made. To the extent that Johnson may have thought Newman suffered from ADD or ADHD, rather than mental retardation, again he was guessing, not making a reasoned assessment after adequate investigation.

The other evidence that was available to Johnson indicated that Newman had an IQ of 62, scored in the lowest possible percentile on basic skills and intelligence test, consistently had trouble understanding abstract concepts, required numerous educational accommodations by the Chicago Public Schools, had been diagnosed mentally retarded by the SSA, and exhibited serious developmental problems, such as bed-wetting as a teenager. This information triggered

an obligation on Johnson's part to undertake a reasonable investigation into Newman's fitness to stand trial and to bring any concerns in that regard to the trial court's attention. See *Strickland*, 466 U.S. at 691; *Brown*, 304 F.3d at 692; *People v. Brown*, 31 Ill.2d 415, 418 (Ill. 1964). A reasonable lawyer would have developed a *bona fide* doubt as to Newman's fitness, which obligated him to conduct further inquiry and alert the trial court so that medical professionals could assess and ultimately assist counsel and the court in determining whether Newman was in fact fit to stand trial. Johnson's failure to adhere to that standard amounted to constitutionally deficient performance.

### 3. Prejudice

Because the Court finds that Newman has fulfilled the deficient performance prong of *Strickland*, it must address whether Newman was prejudiced by Johnson's failure to seek a fitness hearing. Taking all of the evidence into consideration, the Court finds that the evidence presented at the Court's evidentiary hearing confirms that Newman indeed suffered prejudice under *Strickland*. In other words, Newman has proved that there was a reasonable probability that he would have been found unfit to stand trial.

First, the evidence convincingly shows that Newman was unable to provide "meaningful assistance" to his attorney in his defense. Illinois law instructs courts to consider factors such as the defendant's "knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process." 725 ILCS 5/104-16(b)(1). The "ability to repeat legal terms and concepts" is not enough, as it does not indicate "a full understanding of the nature of the allegations." *People v. Lucas*, 904 N.E. 2d 124, 128 (Ill. App. Ct. 2009). In *Lucas*, the court found that the petitioner was unfit because he "had no realistic idea of the severity of the charges" and could not explain things like "who

picked the jury" or how it functioned. *Id*. at 128, 130; see also *United States. v. Williams*, 113 F.3d 1155, 1160 (10th Cir. 1997) (finding that defendant's ability to recite the charges against her, list witnesses, and use legal terminology is insufficient "for proper assistance in the defense requires an understanding that is 'rational as well as factual'") (quoting *Dusky*, 362 U.S. at 402). Here, Newman's only real involvement in his defense was identifying his girlfriend's brother as a potential witness and his house in a photograph. Newman was unable to understand or explain the role of the jury and other essential legal concepts that critically bear on a defendant's competency to stand trial. See *Dusky*, 362 U.S. at 402 ("[I]t is not enough for the [judge] to find that the defendant is oriented to time and place and has some recollection of events', but that the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."). Newman's description of the jury was that they "sat in the courtroom. They sat there and listened. They left out. They came back in. Somebody stood up. They said I was guilty." Newman's assessment does not show an understanding of how the jury makes its decision or of how Newman could have tried to influence that decision with the assistance of his lawyer. See *United States v. Hardy*, 2008 WL 4682218, at *7 (N.D. Okla. Oct. 22, 2008) (defendant unfit where he understood that "the role of the jury is to say you're guilty" without understanding "how a trial is conducted"). While the Court agrees with Respondent that Newman's low IQ alone is not enough to render him unfit for trial, Newman's low IQ in conjunction with the overwhelming evidence of his inability to understand basic legal concepts convinces the Court that there is a reasonable probability that Newman would have been found unfit had he been granted a competency hearing.

In reaching this conclusion, the Court gives substantial weight to the testimony of those witnesses who had an opportunity to observe Newman closer to the time of his trial in 2001-2002. Their testimony and supporting documentation establish that Newman was mentally retarded and functionally illiterate at the time of his trial; at the age of 16, despite trying hard, Newman could not master the alphabet, read the clock, read simple words, or retain information from one day to the next. Each of the witnesses and the bulk of the records from that time period supported the proposition that the Newman of 2001-02 was severely limited in his cognitive abilities, and rather obviously so.

In regard to the two doctors' reports—Dr. Kavanaugh and Dr. Henry—the Court reiterates that it finds Dr. Kavanaugh's testimony and report to be more complete, more relevant, and therefore more reliable. First, Dr. Henry met with Newman more than five years after Kavanaugh did. The Court's task is to determine whether Newman was fit to stand trial at the time of his trial in state court, not today, and therefore relative time matters at least at the margins in assessing the contradictory conclusions of the experts. Second, and most importantly, the lack of time that Henry put into his investigation compared to the other witnesses (both expert and lay) who reached a different conclusion, the absence of any test to confirm his judgment (as opposed to Kavanaugh, who did perform tests), and the abundance of corroborating evidence establishing that Newman was not malingering all undermine Henry's opinions. The collective testimony of Whitington, Dillon, South, and Kavanaugh, as well as the documents and records dating back long before the trial (including the SSA diagnosis and Chicago Public School reports), persuades the Court that the more likely conclusion is that Newman was not malingering, but rather was suffering from severe cognitive limitations. See *People v. Shanklin*, 814 N.E. 2d 139, 144 (Ill. App. Ct. 2004) ("[A] defendant cannot readily feign the symptoms of

mental retardation * * * It is unlikely defendant began faking systems when he was 15 or 16 years old to later use his manufactured retardation to confuse the justice system."). As in *Shanklin,* it is not likely that Newman began faking his symptoms when he was a child in the Chicago Public Schools, going so far as to obtain a diagnosis of mental retardation from the SSA, all in effort "to later use his manufactured retardation to confuse the justice system." *Id.* In order for Henry's conclusions to persuade, they would have to rest on a much broader and firmer basis than they do at present. Ultimately, the Court finds Kavanaugh's testimony and conclusion that Newman was unfit to stand trial to be credible and persuasive given the totality of evidence presented in support of her opinion. See *United States ex rel. Bilyew v. Franzen*, 842 F.2d 189, 193 (7th Cir. 1988) ("[T]he mere passage of time may not make [a retrospective competency hearing] meaningless. The passage of even a considerable amount of time may not be an insurmountable obstacle if there is sufficient evidence in the record derived from knowledge contemporaneous to trial."); *Reynolds v. Norris*, 86 F.3d 796, 803 (8th Cir. 1996) ("When determining whether a meaningful [retrospective fitness] hearing may be held, we look to the existence of contemporaneous medical evidence, the recollections of non-experts who had the opportunity to interact with the defendant during the relevant period, statements by the defendant in the trial transcript, and the existence of medical records.").

Newman also has proved that he was prejudiced by his attorney's failure to investigate obvious red flags—which Johnson himself now acknowledges raised "concerns"—in order to determine whether to request a competency hearing prior to trial. In fact, in many ways this case is closely analogous to *Brown*, cited above, in which the Seventh Circuit concluded its opinion by criticizing the systematic failures that ultimately landed the petitioner in federal court. The court of appeals observed that "Brown's psychiatric illness was not given so much as a sideways

glance" by those who were involved in handling and evaluating Brown's case. *Brown*, 304 F.3d at 699. Here, too, Newman's attorney possessed documentary evidence, which should have, at a minimum, prompted further inquiry. Yet any minimal inquiry that finds support in the record fell woefully short of adequacy, especially in view of the multiple avenues for exploration that went unprobed.

In addition to the prejudice set forth above, one final point is worth mentioning. The state trial court's conclusion that Newman was fit to stand trial (rendered after trial) not only evinced a fundamental misunderstanding of what could constitute a mental deficiency—"*If he was drooling or if his eyes were going someplace, counsel, I assure you, I would have sua sponte asked for a fitness hearing*"—but also defied common sense. The judge's only articulated reasoning—"In fact, it wasn't a yes-or-no matter when I asked him about the second degree murder instruction. He replied no."—doesn't hold up under any conceivable interpretation. Answering "no" to a question that does not call for a yes-or-no answer was a clear sign of trouble, not a justification for finding Newman mentally fit.

In sum, Newman did not receive the competency hearing to which he was entitled to prior to being tried for murder. Thus, taking into consideration all of the evidence from the state court record as well as the evidentiary hearing, the Court concludes that Newman indeed suffered prejudice under *Strickland* by demonstrating that there was a reasonable probability that he would have been found unfit to stand trial had a competency hearing been held.

## III.    Conclusion

For the reasons stated above, pursuant to § 2254(d) and on the basis of the state court record alone, the Illinois courts unreasonably concluded that Newman was not prejudiced by his attorney's failure to explore his fitness to stand trial and bring the issues related to his mental

competency to the state trial court's attention.  In addition, the state court record alone contains enough evidence to establish that Johnson provided ineffective assistance of counsel by failing to investigate known deficiencies in Newman's mental capacity and to raise with the trial judge Newman's fitness to stand trial.  The additional testimony and evidence presented in the federal evidentiary hearing further supports the Court's conclusions that Johnson's performance fell below the constitutional minimum and that Newman was prejudiced by his counsel's performance because there is a reasonable probability that Newman would have been declared unfit to stand trial at a competency hearing.  Therefore, the Court finds that pursuant to § 2254(a) Newman is being held in custody in violation of the Constitution or law or treaties of the United States and grants Newman's request for a writ of habeas corpus.  The Court directs Respondent to release Newman unless, within 180 days of this order, he is given a new trial on the charges against him should he be found fit to stand trial.  See *Richardson v. Hardy*, 855 F. Supp. 2d 809, 846 (N.D. Ill. 2012).

Dated:  November 8, 2012

_____
Robert M. Dow, Jr.
United States District Judge